Robert H. McKELVY and
Maxine McKelvy
v.
The UNITED STATES.

R. Hugh McKELVY and Tula E. McKelvy
v.
The UNITED STATES.
Nos. 357–71, 358–71.

United States Court of Claims.
May 11, 1973.

Edward R. Smith, Lubbock, Tex., attorney of record, for plaintiffs; Smith & Baker, Lubbock, Tex., of counsel.

Richard D. Silvester, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant; Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

KASHIWA, Judge:*

The above-entitled claims are consolidated suits for the refund of federal income taxes for calendar year 1969. An assessment was made by the Government on a "distribution and loan-back" transaction made on or about April 12, 1969, between McKelvy Furniture, Inc. and its shareholders, Robert H. and Maxine McKelvy and R. Hugh and Tula E. McKelvy, involving the amounts of $5,136.-17 and $17,851.74, respectively. The total consolidated refund claimed is $6,192.02 ($1,570.51 claimed by Robert

H. and Maxine McKelvy; $4,621.51 claimed by R. Hugh and Tula E. McKelvy) together with interest.

The sole question is whether the said April 12, 1969, transaction was a taxable dividend to the extent of earnings and profits of McKelvy Furniture, Inc. for its fiscal year ending January 31, 1970. We find for the defendant in both cases.

McKelvy Furniture, Inc. was incorporated under the laws of the State of Texas on February 1, 1959; its place of business was Lubbock, Texas. From its inception through its fiscal year ending January 31, 1969, the corporation elected to be taxed as a small business corporation under Subchapter S of the Internal Revenue Code of 1954, as amended, 26 U. S.C. §§ 1371–1378 (1970).[1] The corporation properly terminated its election to be a small business corporation under Subchapter S beginning with its fiscal year ending January 31, 1970, that is, as of February 1, 1969. Plaintiffs Robert H. and Maxine McKelvy together owned, as their community property, 50 percent of the outstanding stock of the corporation, the remaining 50 percent being owned by plaintiffs R. Hugh and Tula E. McKelvy together as their community property. Such stock ownership was and has been the same for all periods material to this litigation. Taxpayers are on a calendar-year basis for the purpose of filing their personal income tax returns and were on such a calendar-year basis for the year 1969.

The corporation reported current earnings and profits of $21,058.33 for its fiscal year ending January 31, 1969, and $14,378.30 for its fiscal year ending January 31, 1970. These figures are taken from the income tax returns of McKelvy Furniture, Inc. for its fiscal years ending January 31, 1969, and January 31, 1970, which have been stipulated as accurately reflecting earnings and profits for the purposes of these cases. At the beginning of the fiscal year end-

---

\* This opinion contains all the essential findings of fact as stipulated by the parties.

1. All references to statutory tax provisions are to the Internal Revenue Code of 1954, as amended.

ing January 31, 1969, the corporation reported that it had previously taxed income (hereinafter referred to as PTI) totaling $36,017.97. By the end of that taxable year, the corporation reported on its books that this amount of PTI had been reduced by $35,941.67[2] to $76.30. No reduction was reported in the corporation's capital stock account at any time during the fiscal years ending January 31, 1969, or January 31, 1970. On January 31, 1969, McKelvy Furniture, Inc. had $3,465.86 in cash on hand.

On January 30, 1969, the directors of the corporation lawfully and effectively adopted the following resolution:

> RESOLVED, That there be declared, and there is hereby declared, a dividend payable to the shareholders of record at the present time in the amount of $57,000, such dividend to be paid as follows: All accounts receivable from R. Hugh McKelvy and Robert H. McKelvy shall be forgiven and cancelled on January 31, 1969, and the balance of such dividend of $57,000 shall be paid in cash on or before April 15, 1969.

The dividend payable of $57,000, above mentioned, was paid by the corporation as shown below:

|  | Robert H. McKelvy | R. Hugh McKelvy |
|---|---|---|
| By credit on the corporation's books on January 31, 1969, to accounts receivable: |  |  |
| From Robert H. McKelvy | $23,363.83 |  |
| From R. Hugh McKelvy |  | $10,648.26 |
| By the corporation's check dated and given April 12, 1969 | 5,136.17 | 17,851.74 |
| Total | $28,500.00 | $28,500.00 |

At the time (and immediately prior thereto) the corporation's above-described checks, dated April 12, 1969, in the respective amounts of $5,136.17 and $17,851.74, were given to taxpayers, the corporation's checking account showed a balance of $21,695.22. On April 11, 1969, the matter of paying the balance of the $57,000 dividend was discussed by taxpayers and the certified public accountant who represented the corporation and them. It was then agreed that to finance such a balance taxpayers would make loans back to the corporation. Upon receipt by taxpayers of the corporation's checks, dated April 12, 1969, described above, the respective payees endorsed the checks and deposited them to the corporation's checking account to the extent of $5,000 and $17,750, respectively, taking and retaining the balances of $136.17 and $101.74, respectively, in cash. The amounts so deposited to the corporation were treated by all parties thereto as loans from the respective taxpayers to the corporation. No notes were given by the corporation to evidence those loans.

At the end of the fiscal year ending January 31, 1969, the corporation's balance sheet showed dividends payable of $22,987.91. This figure had been reduced to zero by the end of the fiscal year ending January 31, 1970, but nothing appears in any of the exhibits or stipulations to indicate exactly what happened to this figure. On their calendar year income tax returns for 1969, taxpayers each reported as income $10,529.16, their pro rata shares of the corporation's current earnings and profits for its fiscal year ending January 31, 1969. Taxpayers reported no additional amount on their 1969 returns as a dividend or other income from McKelvy Furniture, Inc. In the audit of taxpayers' 1969 income tax returns, the Internal Revenue Service determined that the loans from taxpayers to the corporation on the transaction heretofore described constituted dividends to taxpayers in calendar year 1969 out of earnings and profits of the corporation's fiscal year ending January 31, 1970, available in

---

2. This $35,941.67 plus $21,058.33 current earnings and profits for the corporation's fiscal year ending January 31, 1969, totals $57,000.00. Thus, it is clear that the taxpayers' original intent, as expressed in the resolution recited in the next paragraph, was to distribute, totally, current earnings and profits as well as nearly all of the PTI.

1969. Based upon that determination, taxes and interest were assessed against taxpayers. The Government viewed the transactions as follows:

| | |
|---|---:|
| Fiscal 1969 earnings and profits (taxable to taxpayers in calendar 1969 under Subchapter S) | $21,058.33 |
| Fiscal 1970 earnings and profits available in 1969 (taxable to taxpayers in calendar 1969 as a result of April 12, 1969, distribution of corporation obligations) | 14,378.30 |
| Balance of dividend obligation (tax effects not determined by Internal Revenue Service and not in issue here) | 21,463.37 |
| Total | $57,000.00 |

Based upon this determination, taxes and interest were assessed against taxpayers. Taxpayers paid the assessments and filed timely claims for refund thereof, which claims were disallowed by the Commissioner of Internal Revenue on March 30, 1971.

The very narrow question presented to this court is whether the above-described "distribution and loan-back" transaction of April 12, 1969, was a taxable dividend to the extent of earnings and profits of McKelvy Furniture, Inc. for its fiscal year ending January 31, 1970 (in the amount of $14,378.30).[3]

Before reaching this question, however, it is necessary to distinguish the consequences of distributions with respect to regular Subchapter C corporations on the one hand and Subchapter S corporations on the other. In a regular corporation, for federal tax purposes, distributions of cash or other property to stockholders are deemed dividends to the extent of current and accumulated[4] earnings and profits with current earnings and profits deemed to be the first source of payment. Section 316(a). Any such distributions after exhausting

earnings and profits are deemed to be payment of capital and are not taxable income but reduce the basis of the shareholder's stock. Section 301(c)(2). Distributions can only reduce basis to zero, and any distribution in excess of basis is governed by the rules of section 301(c)(3),[5] not here relevant.

A somewhat altered structure has been created in the Subchapter S context. If the electing corporation distributes dividends, they are includible in the shareholders' gross income in the same manner as dividends distributed by regular corporations. Treas.Reg. § 1.-1372–1(c)(2) and (7); DeTreville v. United States, 445 F.2d 1306, 1309 (4th Cir. 1971). The Subchapter S provisions go on to deal with a new category of account, known as "undistributed taxable income" (hereinafter referred to as UTI), and defined by section 1373(c) to be:

> \* \* \* taxable income \* \* \* minus \* \* \* the amount of *money* distributed as dividends during the taxable year, to the extent that any such amount is a distribution out of earnings and profits of the taxable year as specified in section 316(a)(2). [Emphasis supplied.]

After the amount of UTI is calculated. section 1373(b), an operational section, prescribes the following addition to gross income not contemplated by regular corporations:

> (b) *Amount included in gross income.*
> Each person who is a shareholder of an electing small business corporation on the last day of a taxable year of such corporation shall include in his gross income, for his taxable year in which or with which the taxable year

---

3. We note that the parties have avoided discussion of the $21,463.37 which the Government designates "(tax effects not determined by Internal Revenue Service and not in issue here)." We restrict ourselves specifically to the sole question above indicated.

4. We omit from this discussion, here and *infra*, those exceptional circumstances in-

volving earnings and profits accumulated on or before February 28, 1913. Section 301(c)(1); section 316(a)(1).

5. We omit from this discussion, here and *infra*, those exceptional circumstances involving distributions out of an increase in value accrued before March 1, 1913. Section 301(c)(3)(B).

of the corporation ends, the amount he would have received as a dividend, if on such last day there had been distributed pro rata to its shareholders by such corporation an amount equal to the corporation's undistributed taxable income for the corporation's taxable year. For purposes of this chapter, the amount so included shall be treated as an amount distributed as a dividend on the last day of the taxable year of the corporation.

Section 1377(a) provides that earnings and profits are reduced by these constructive dividends in the same way that actual dividends reduce earnings and profits.

Any amount which is included in the gross income of the shareholder as a constructive dividend by virtue of section 1373(b) increases the basis of his shares, just as if he had made a capital contribution to the corporation. Section 1376(a). To account for the fact that UTI is being taxed to the shareholders, the Subchapter S provisions set up a system whereby an actual distribution in a later year of these previously taxed constructive dividends may be received by the shareholder without the imposition of a second tax. Under section 1375(d), set out below,[6] the shareholder computes his net share of the corporation's UTI. This is the sum of all the amounts which, under 1373(b), have been included in his gross income as constructive dividends less the sum of both allowable net operating loss deductions passed through to him under section 1374(b) and, of course, any amounts previously distributed to the shareholder under the provisions of section 1375(d) itself. Treas.Reg. § 1.-1375–4(b)[7] sets forth the requirement

6. "(d) *Distributions of undistributed taxable income previously taxed to shareholders.*

"(1) Distributions not considered as dividends. An electing small business corporation may distribute, in accordance with regulations prescribed by the Secretary or his delegate, to any shareholder all or any portion of the shareholder's net share of the corporation's undistributed taxable income for taxable years prior to the taxable year in which such distribution is made. Any such distribution shall, for purposes of this chapter, be considered a distribution which is not a dividend, but the earnings and profits of the corporation shall not be reduced by reason of any such distribution.

"(2) Shareholder's net share of undistributed taxable income. For purposes of this subsection, a shareholder's net share of the undistributed taxable income of an electing small business corporation is an amount equal to—

"(A) the sum of the amounts included in the gross income of the shareholder under section 1373(b) for all prior taxable years (excluding any taxable year to which the provisions of this section do not apply and all taxable years preceding such year), reduced by

"(B) the sum of—

"(i) the amounts allowable under section 1374(b) as a deduction from gross income of the shareholder for all prior taxable years (excluding any taxable year to

which the provisions of this section do not apply and all taxable years preceding such year), and

"(ii) all amounts previously distributed during the taxable year and all prior taxable years (excluding any taxable year to which the provisions of this section do not apply and all taxable years preceding such year) to the shareholder which under subsection (f) or paragraph (1) of this subsection were considered distributions which were not dividends."

7. "(b) *Source of distribution.* Except as provided in paragraph (c) of this section, any actual distribution of money by an electing small business corporation to a shareholder which, but for the operation of this section, would be a dividend out of accumulated earnings and profits shall be considered a distribution of previously taxed income to the extent of the shareholder's net share of previously taxed income immediately before the distribution. Thus, a distribution of property other than money or a distribution in exchange for stock, or a constructive distribution under section 1373(b), is never a distribution of previously taxed income. Since current earnings and profits are first applied to distributions of money which are not (1) in exchange for stock, or (2) distributions of the corporation's undistributed taxable income for the immediately preceding taxable year under section 1375(f) and § 1.1375–6 (see para-

that distributions, to qualify for the benefits of section 1375(d), must be made in money. This is altogether consistent with the plan of Subchapter S since, as noted *supra*, a distribution to reduce UTI under section 1373(c) must be in money. It simply could not be the case that a shareholder who was prevented by the "money" requirement of section 1373(c) from reducing his UTI account in fiscal year one could, by the simple expedient of waiting for fiscal year two, be then entitled to reduce the PTI account by a property-other-than-money distribution. This would defeat the Subchapter S scheme because the shareholder's PTI account is made up of the same UTI which was included in income as a constructive dividend pursuant to section 1373(b). See DeTreville v. United States, *supra*, 445 F.2d at 1311–1312, for a case upholding the validity of Treas.Reg. § 1.1375–4(b). It should also be noted that under this same Regulation, the corporation must make a money distribution in excess of its current earnings and profits before amounts can be withdrawn from the PTI account.

It can thus be seen that the real value of the PTI account is that, if the distribution otherwise qualifies, the shareholder will be allowed to withdraw money without dividend consequences even though there are accumulated earnings and profits [8] which, in the regular corporate situation, would precede all forms of capital and be available as a source for dividends. The Subchapter S election alters the basic order. However, a termination of the Subchapter S election alters this privileged treatment of the PTI funds and re-establishes the basic rule that all the earnings and profits, both current and accumulated, must be exhausted before the capital accounts may be invaded [9] (save for the exception of section 1375(f), to be considered *infra*).

Taxpayers make the argument that the April 12, 1969, "distribution and loan-back" transaction was a money distribution which, since made within 2½ months of the close of the corporation's previous fiscal year, relates back to that previous fiscal year pursuant to the provisions of section 1375(f).[10] If,

graphs (d) and (e) of § 1.1373–1), a distribution of previously taxed income may occur only if during its taxable year the corporation makes such money distributions in excess of its earnings and profits for such taxable year. (See § 1.1375–5 for rules with respect to certain distributions of money which may be treated as having been made in a preceding taxable year.)"

8. We include this as background to our discussion, *infra*, of legislative intent. Actually, McKelvy Furniture, Inc. did *not* have any accumulated earnings and profits.

9. Sec. 1.1375–4(a) provides in part:
"* * * If an election is terminated under section 1372(e), the corporation *may not, during the first taxable year to* which the termination applies or during any subsequent taxable year, distribute previously taxed income of taxable years prior to the termination as a non-dividend distribution pursuant to this section. * * *"

10. Section 1375(f) continues the Subchapter S scheme of requiring money distribu-

tions in order to receive non-dividend treatment. This is true in all cases, other than a classic return of capital (as contrasted with a return of PTI). See our discussion, *supra*, with respect to present year reductions of UTI (section 1373(c)) and later withdrawals from PTI (section 1375(d)). Section 1375(f) reads as follows:

"(f) *Distributions within 2½-month period after close of taxable year.*

"(1) Distributions considered as distributions of undistributed taxable income. Any distribution of money made by a corporation after the close of a taxable year with respect to which it was an electing small business corporation and on or before the 15th day of the third month following the close of such taxable year to a person who was a shareholder of such corporation at the close of such taxable year shall be treated as a distribution of the corporation's undistributed taxable income for such year, to the extent such distribution (when added to the sum of all prior distributions of money made to such person by such corporation following the close of such year) does not exceed such

as taxpayers argue, section 1375(f) applies, the distribution would be applied against the undistributed taxable income for the preceding year if such undistributed taxable income was required to be included in the shareholders' gross income by virtue of section 1373(b).[11] The basic problem with this analysis is the factual premise upon which it is based. We find, for reasons hereinafter stated, that the April 12, 1969, distribution was not a money distribution.

As noted above, at the time the checks, in the aggregate amount of $22,987.91, were issued, the corporation's checking account showed a balance of $21,695.22. Thus, to finance the April distribution, the corporation found it necessary to have the checks endorsed back to it, the two parties retaining the odd dollar amounts totaling $237.91 (i.

e., Robert H. McKelvy retained $136.17 and R. Hugh McKelvy retained $101.-74).[12] Looking to the substance of the transaction rather than its form and viewing this series of interrelated steps as an integrated whole, what we have is not a distribution of money, but, rather, the distribution of corporate obligations.[13] George A. Roesel, 56 T.C. 14 (1971). See also Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652 (5th Cir. 1968).

The Regulations interpreting section 1375(f) address themselves to our particular case:

(iii) For purposes of this subparagraph and subparagraph (3)(ii) of this paragraph, a distribution of money does not include a distribution of

person's share of the corporation's undistributed taxable income for such year. Any distribution so treated shall, for purposes of this chapter, be considered a distribution which is not a dividend, and the earnings and profits of the corporation shall not be reduced by reason of such distribution.

"(2) Share of undistributed taxable income. For purposes of paragraph (1), a person's share of a corporation's undistributed taxable income for a taxable year is the amount required to be included in his gross income under section 1373(b) as a shareholder of such corporation for his taxable year in which or with which the taxable year of the corporation ends.

"(3) Election under subsection (e). Paragraph (1) shall not apply to any distribution with respect to which an election under subsection (e) applies."

11. The Government might have argued that the January 31, 1969, transaction whereby the loan accounts of the shareholders were canceled, was in reality a money distribution. If we were to adopt this position, there would be no UTI for fiscal 1969 to which a later distribution (even if otherwise qualifying under section 1375(f) by being in money) could be applied against. See Randall N. Clark, 58 T.C. 94 (1972). If, on the other hand, the January distribution is one of property other than money, then the complex allocation provisions set forth in Treas.Reg. § 1.1373-1 (e) and (g) would be applicable. Whatever amount of UTI which is the subject

of a constructive dividend could, of course, be offset by a subsequent cash distribution otherwise complying with section 1375(f). While it may be true that a portion of the distributions involved may receive non-dividend treatment, it is clear that the earnings and profits of both fiscal years will be consumed as dividends (actual or constructive) no matter what method is chosen.

In any event, since the Government has chosen to rely on the fact that the April "check-loanback" transaction was not a money distribution and since we agree with the Government on this point, there is no need to categorize the January cancellation of the loan accounts. The basis for the tax deficiency in this case only concerns whether or not the earnings and profits of fiscal 1970 are available for dividends because of the April distribution.

12. Although the parties have not drawn our attention to the problem, it is evident that, to the extent of the $237.91, a money distribution was made. However, since the earnings and profits which the Government seeks to make available for taxable dividends (less than $15,000) is so much less than the amount of the April distribution (more than $22,000), our holding is not altered.

13. The parties agree that the amounts endorsed over to the corporation were treated by all parties as loans to the corporation, although no formal notes were given to evidence these loans.

an obligation of the corporation, a distribution of property other than money in satisfaction of a dividend declared in money, or a distribution in exchange for stock. [Treas.Reg. § 1.-1375–6(a)(2)(iii).]

The validity of this Regulation is beyond question, and it was so held in Randall N. Clark, *supra*, footnote 11. We hold this regulation to be reasonable and consistent with the normal meaning of the statutory language. Commissioner v. South Texas Lumber Co., 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948).

The taxpayers next argue that even if they do not qualify for the benefits of section 1375(f), the fiscal 1970 earnings and profits remain unavailable for taxable dividends despite the April, 1969, distribution, because of the effect of the January declaration. The effect of this argument is as follows: since a dividend was declared in the amount of $57,000 on January 30, 1969 (immediately prior to the end of fiscal 1969), the consequence of any later distribution in discharge of this $57,000 liability must be determined by reference to the earnings and profits, PTI account, accumulated earnings and profits, and capital of the corporation during fiscal 1969. They also argue that even if the April 12, 1969, transaction is a distribution of a corporate obligation, it relates back to January 30, 1969, the date of constructive receipt, in order to determine the nature of the distribution. Before entering into a discussion of this issue, it is necessary to appreciate the planning problems which confronted the Subchapter S corporation shareholders prior to the enactment of section 1375(f), *supra*.

Section 1375(d),[14] as we have said, was designed to permit the tax-free distribution of amounts previously taxed to the Subchapter S shareholder as constructive dividends from undistributed taxable income. However, there were substantial limitations on the shareholder's right freely to distribute from his PTI account. First, a distribution to qualify as coming from PTI, had to be in money. Treas.Reg. § 1.1375–4(b),[15] DeTreville v. United States, *supra*. Second, the PTI account is subject to reduction by the amounts allowable as deductions under section 1375(b) (pass-through of net operating losses). Third, a tax-free distribution in a later year, even if in cash and even if there are sufficient amounts in PTI to cover the distribution, cannot be made until *after* the corporation's current earnings and profits have been distributed. Treas. Reg. § 1.1375–4(b).[16]

Finally, there existed the problem of a termination of the Subchapter S status. During Subchapter S status, cash distributions would be applied in the following order: First, to current earnings and profits; second, to previously taxed undistributed taxable income (PTI); third, to accumulated earnings and profits (if any); and finally, as in regular corporations, to a reduction of basis to zero with any distribution in excess of basis governed by the rules of section 301(c)(3). However, once the Subchapter S election was terminated, the shareholder no longer had the privilege of a tax-free distribution out of PTI if accumulated earnings and profits were present.[17] Of course, if there were no accumulated earnings and profits, then, after current earnings and profits were exhausted, the tax-free distribution could be made out of capital.

The cumulative effect of all these factors gave rise to a situation in which the taxpayer possessed a potentially advantageous PTI account, but was often unable, for the above-stated reasons, to derive any tax benefit from it. Thus, Congress, in 1966, addressed itself to the

14. See footnote 6, *supra*.

15. See footnote 7, *supra*.

16. See also Treas.Reg. § 1.1373–1(d) and (e), which provides that money distributed must be treated as a taxable dividend to the extent of current earnings and profits.

17. See Treas.Reg. § 1.1375–4(a) (last sentence) and § 1375(d)(2)(A) (parenthetical).

problem of these so-called "locked-in" earnings.[18]

■ In order to prevent a lock-in of earnings, shareholders had been under pressure accurately to forecast the earnings by the year's end in order to prevent any amount from being taxed as a constructive dividend under section 1373(b). Congress' solution was to enact section 1375(f).[19] Generally speaking, under this remedial provision, all money distributions made within 2½ months of the close of the corporation's previous fiscal year are treated as distributions of the corporation's undistributed taxable income for the previous year. In other words, Congress provided, with respect to money distributions, a limited relation-back provision. The money distribution was deemed to have been received in the prior fiscal year. If the standards of section 1375(f) were met, the shareholder was no longer faced with the problem of first having to exhaust his current earnings and profits. The shareholder simply reduced his undistributed taxable income for the previous year. The plaintiffs, in effect are telling us that they did not need section 1375(f) to provide them with a justification for relating back subsequent distributions to the previous year. Plaintiffs assert that the judicial doctrine of constructive receipt already existed with respect to Subchapter S to the same extent that the doctrine exists with respect to regular corporations. It is our view that the plaintiffs are completely in error in this assertion. While we are mindful of the general proposition that Subchapter S corporations are subject to the general corporate provisions, we must also realize that the Subchapter S provisions in certain areas displace the general corporate rules. This principle is most clear-

ly evident with respect to the highly technical rules of Subchapter S, which allow, in very prescribed situations, non-dividend treatment.

In Attebury v. United States, 430 F. 2d 1162 (5th Cir. 1970), the taxpayer made a similar contention. The facts of that case, as simplified for discussion, are as follows: The corporation declared a dividend during fiscal year one. No actual distributions, however, were received by the shareholders during fiscal year one. During fiscal year two, many cash distributions were made. The Government conceded, at the time of appeal, that the cash distributions made within 3½ months[20] of the close of fiscal year one satisfied section 1375(f) and related back to fiscal year one to reduce undistributed taxable income with no dividend consequences. With respect to the cash distributions made after the 3½-month grace period, the taxpayers pointed out that these amounts had already been included in their personal calendar year one returns by virtue of sections 1373(a) and (b). They put forth two arguments: (1) that they were in "constructive receipt" of all the corporation's undistributed taxable income as if such income had been distributed to them on the last day of the corporation's fiscal year one; and (2) that the cash distributions were payments by the corporation to them on corporate debts created prior to the end of the corporation's fiscal year one by the declaration of a dividend equal to the amount of the corporation's taxable income. The Government, on the other hand, contended that the payments after the 3½-month grace period (but still during the taxpayers' personal year one calendar year) were taxable as dividends to the extent of the corporation's earnings and profits for its fiscal year two.

18. See Note, "Locked-In Earnings"—How Serious a Problem Under Subchapter S?, 49 Va.L.Rev. 1516 (1963).

19. See, generally, S.Rep.No.1007, 89th Cong., 2d Sess., pp. 1–6 (1966–1 Cum. Bull., pp. 527–531).

20. A 3½-month period may be elected for pre-April 14, 1966, distributions.

The Fifth Circuit in *Attebury* noted that section 1373(c) defines "undistributed taxable income" as

\* \* \* taxable income .\* \* \* minus \* \* \* the *amount of money distributed as dividends during the taxable year* \* \* \*. [Emphasis supplied.]

The court then went on to hold that because of the clear language of section 1373(c) the taxpayers could not employ the constructive receipt doctrine in a new definition of what amounts were distributed during the taxable year. Rather, the only amounts which could be considered as distributed during fiscal year one (and which would reduce undistributed taxable income) were actual cash distributions to shareholders before the end of the corporate year. Section 1375(f) merely extends for 2½ months (or in some cases 3½ months) the right to make a cash distribution to reduce the undistributed taxable income. The Government's basic argument was that the doctrine of constructive receipt was not applicable to Subchapter S corporations since the dividend declaration added nothing to the taxability of the otherwise undistributed current earnings and profits of the corporation. Thus, cash distributions made during fiscal year two, after the relief period for fiscal year one, had to represent a distribution of earnings and profits for fiscal year two. We are in agreement with the Fifth Circuit's analysis:

The legislative history of section 1375(f) clearly demonstrates that the relief provision was intended to solve the bunching-of-income problem, resulting from a Subchapter S corporation's inability to make actual cash distributions of its taxable income before the end of its taxable year. From the above legislative history, it is clear to us that Congress interpreted the Subchapter S provisions as requiring the following: Unless such actual cash distributions were made before the close of the corporation's tax year (thus reducing the amount of undistributed taxable income for that year to the extent such distributions were dividends), they were includable in the shareholders' gross income when ultimately distributed in the subsequent tax year of the corporation to the extent of that year's earnings and profits. *This analysis forecloses use of the constructive receipt doctrine in the manner proposed by taxpayers and implemented by the district court.* [Footnotes omitted.] [430 F.2d at 1170–1171.] [Emphasis supplied.]

█ In the instant case, the taxpayers are faced with further difficulties. Treas.Reg. § 1.451–2(b) (1969), which defines the constructive receipt doctrine, requires that

\* \* \* Dividends on corporate stock are constructively received when unqualifiedly made subject to the demands of the shareholder \* \* \*.

Even assuming the applicability of the constructive receipt doctrine to the cases at bar, taxpayers have failed to show that the precise requirements of the doctrine have been met with respect to the transactions being considered.

█ Treas.Reg. § 1.451–2(a) (1969) explains that even in situations where the doctrine can legally be applied, "income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions." Since taxpayers are contending that the amount of the April 12 distribution was constructively received by January 31, 1969, they must show that there were no "substantial limitations or restrictions" to their control of the money on January 31, 1969. It has long been held that lack of available funds by a corporation to pay a dividend does constitute a substantial limitation to the shareholder's control of the funds in question. Johnson v. Commissioner, 25 T.C. 499 (1955); Estate of Bach v. Commissioner, 9 B.T.A. 1404 (1928); Northern Trust Co. v. Commissioner, 8 B.T.A. 685 (1927).

The balance sheet attached to the corporation's fiscal 1969 income tax return, Joint Exhibit 3–C, shows that the corporation had only $3,465.86 in cash on hand on January 31, 1969, with which it could have paid the purported dividend liabilities, as well as any other current liabilities.

The *Attebury* decision also rejected the taxpayers' assertion that distributions made in the corporation's second fiscal year were payments on corporate debts created prior to the end of the tax year by the declaration of a dividend equal to the amount of the corporation's taxable income. The taxpayers in the cases before us make a similar argument focusing on the asserted dividend liabilities created prior to the end of the corporation's first fiscal year. Those cases cited by taxpayers [21] were all cases under the law prior to the enactment of the Subchapter S provisions. The Fifth Circuit, which had decided the *Roe* case, made the following statement with respect to the effect of the Subchapter S provisions on the previous law:

> Implicit in our decision in *Roe* * * * is the inclusion in the shareholder's gross income, when the dividend is declared, of an amount equal to the declared dividends, pursuant to the constructive receipt doctrine. 192 F.2d at 402–403. Since we have concluded that the constructive receipt doctrine is inapplicable, * * * the *Roe* decision is clearly distinguishable. * * * [430 F.2d at 1172.]

While *Attebury* involved the Subchapter S provisions requiring a cash distribution of current earnings (section 1373(c) and the Regulations, thereunder), the theory of its holding is applicable to the Subchapter S regulations requiring a cash distribution from the PTI account made consistent with all the other rules of section 1375(d). Since the constructive receipt doctrine is not applicable to either case, what is required, under the Subchapter S structure, is an actual and timely distribution of money.

██ In a final attempt to distinguish the *Attebury* case, the plaintiffs in the instant cases assert that even assuming that the Fifth Circuit was correct, the fact that the Subchapter S election was terminated after the corporation's first fiscal year in the instant cases, while the *Attebury* corporation retained its Subchapter S status throughout, is significant. We hold that the termination of the Subchapter S election for fiscal year two does not mean that the regular corporate rules (of which constructive receipt may be one) apply to the declaration made in fiscal year one, an admitted Subchapter S year. It is true that section 1375(f) permits a money distribution to be made within 2½ months after the close of the previous fiscal year, even if the corporation ceases to be governed by Subchapter S for the second fiscal year. However, this remedial provision is limited and provides the only possible way that the taxpayers in our case could take advantage of Subchapter S privileges. Unfortunately for the plaintiffs, the April, 1969, transaction was not a money distribution. Thus, when actually made, this distribution must be governed by the rules of regular corporations under which all distributions, including distributions of corporate obligations, are taxable to the shareholders to the extent of earnings and profits.[22] Thus,

---

21. Roe v. Commissioner, 192 F.2d 398 (5th Cir. 1951), Commissioner v. Goldwyn, 175 F.2d 641 (9th Cir. 1949). See Fehrs Finance Co., 58 T.C. 174, 192–194 (1972), for a recent and very restrictive interpretation of the *Goldwyn* case.

22. See C. D. and Sarah Fountain, et al., 59 T.C. 696, decided February 22, 1973.

The court, after finding that a distribution of checks under the circumstances of that case was a distribution of property and not money, held that the benefits of section 1375(f) were not available and therefore the dividend was measured by the current and accumulated earnings and profits of the actual year of distribution, which was fiscal year two of the corporation. The

\* \* \* [T]he right to make a nondividend distribution of previously taxed income under. § 1375(d) [although the relief provisions of section 1375(f) remain available if the standards are met] lasts only as long as the Subchapter S election remains in force, and evaporates if the election is terminated. A post-termination distribution will be governed by the usual rules of § 301, under which all current and accumulated earnings and profits must be distributed as dividends before the corporation can make a nondividend distribution. Thus, a distribution that would have been shielded by § 1375(d) if the Subchapter S election had remained in effect may constitute a dividend if made after the election is terminated. Of course, this will be true only if the corporation has current or accumulated earnings and profits when the distribution is made. In this connection, it should be noted that the corporation might have earnings and profits because (a) it had an accumulation of earnings and profits when it made the Subchapter S election, which were not distributed while the election was in force; (b) it accumulated some earnings and profits during the Subchapter S period; or (c) its operations after the election was terminated produced earnings and profits. [Footnotes omitted.] [Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 6–29, 6–30 (3d ed. 1971).]

Since, in the instant case, McKelvy Furniture, Inc. produced $14,378.30 of earnings and profits during its fiscal year ended January 31, 1970 (when it was not a Subchapter S corporation), the Government's position that these earnings and profits were available for dividend distribution is correct. Therefore,

plaintiffs are not entitled to recover and the petitions are dismissed.

SKELTON, Judge (dissenting):

I respectfully disagree with the opinion of the court in this case. The court has restricted itself to what it describes as the "sole question" and the "narrow question" of whether the April 12, 1969, transaction was a taxable dividend to the extent of earnings and profits of McKelvy Furniture, Inc., in the sum of $14,378.30 for its fiscal year ending January 31, 1970. In so limiting its opinion, the court has erred. Such question is "narrow," indeed, but it is not the "sole" question in the case. This restriction of the court's decision to this isolated transaction leaves many questions unanswered and many issues undisposed of. In fact, the April 12, 1969, transaction, instead of being the controlling factor in this case, is, for all practical purposes, irrelevant and immaterial, because it did not materially alter the position of the taxpayers, nor change the situation that already existed as of January 31, 1969, as will be shown below. Actually, the April 12, 1969, transaction related back to the actions of the directors on January 30 and 31, 1969.

In Union Pacific R.R. v. United States, 401 F.2d 778, 185 Ct.Cl. 393 (1968), cert. denied, 395 U.S. 944, 89 S. Ct. 2017, 23 L.Ed.2d 462 (1969), we held that where a series of events have occurred in a case, it is not proper to decide the case on the basis of the most recent event, but it is necessary to consider all of the events and view the case from its four corners. In that case, the plaintiff was seeking to recover a refund of excess profits taxes for the year 1942 by increasing its equity invested capital. It had issued bonds in 1901 and 1907 that were convertible into common stock on a fixed par value basis for

taxpayers had argued, *inter alia*, that the extent to which the issuance of checks should be taxed as dividends was limited to the earnings and profits accumulated at the end of the taxable year prior to fiscal

year one of the corporation. As in the instant case, the corporation in *Fountain* was governed by Subchapter S in fiscal year one, and not in fiscal year two.

both. Many years later the bonds were converted into stock. The plaintiff contended that the court should look only to the situation existing at the time of conversion and by so doing it would be allowed to include the increased fair market value of the stock in its equity invested capital. We held that the case should not be decided by considering only the most recent transaction (the bond-stock conversion), but that we had to go back to the beginning and consider all of the events that had occurred. There we said:

> * * * It is necessary to go back to the beginning of the transaction and consider ·all of the facts from that time up to and including the conversion of the bonds for the stock and look at the case from its four corners. The plaintiff would have us consider only what happened at the time of the conversion as if the exchange of the bonds for the stock was a new and independent act with no connection with what had transpired before. . This we cannot do, as "the tail must go with the hide." 401 F.2d at 781, [185 Ct. Cl. at 400.]

In like manner in the case before us, the defendant would have us consider only what happened at the time of the transaction on April 12, 1969, as if that transaction was a new and independent act with no connection with what had transpired before. The court has agreed to this line of reasoning and in so doing has fallen into error, as will be fully shown below.

This case, like all tax cases involving Subchapter S corporations, appears at first glance to be difficult of solution because of the complicated nature of the statutes and regulations governing such corporations. However, by starting at the beginning and considering all of the events and transactions that have transpired up to and including the most recent event of April 12, 1969, and applying the applicable law to them in sequence, we find that the various elements and segments of the case fall logically into place and as a consequence, the solution of the case is not nearly as difficult as it first appeared.

Therefore, starting at the beginning and going forward we find the following events and transactions occurred, some of which are mentioned by the court, but most of which were ignored by it in deciding the case.

The McKelvy Furniture, Inc., is a Texas corporation chartered under the laws of that State on February 1, 1959. From the beginning it was a small business corporation under Subchapter S of the Internal Revenue Code of 1954, *as amended,* 26 U.S.C. §§ 1371–1378. The plaintiffs are the sole stockholders of the corporation and have been such since the corporation was chartered. The taxpayers were on a calendar year basis, but the corporation was on a fiscal year basis ending on January 31 of each year during the years involved in this case. The corporation terminated its election to be a small business corporation under Subchapter S for its fiscal year ending January 31, 1970.

On January 31, 1969, the balance sheet of the corporation showed the following:

### Assets

| | |
|---|---|
| Cash | $ 3,465.86 |
| Trade Notes and Accounts Receivable .. | 261,197.48 |
| Inventories | 172,811.55 |
| Buildings and other Fixed Depreciable Assets ...... $40,630.13 | |
| Less accumulated depreciation ............... 26,177.69 | |
| | 14,452.44 |
| Finance Reserves | 15,125.74 |
| Utility Deposits | 385.37 |
| Total Assets | $467,438.44 |

### Liabilities and Shareholders' Equity

| | |
|---|---|
| Accounts Payable | $100,595.34 |
| Mortgages, Notes, Bonds payable in less than one year | 252,798.45 |
| Dividends Payable | 22,987.91 |
| Payroll Taxes Payable | 1,795.28 |
| State Sales Tax Payable | 4,466.49 |
| Capital Stock | 84,000.00 |
| Paid-in or Capital Surplus | 718.67 |
| Shareholders' Undistributed Taxable Income | 76.30 |
| Total Liabilities and Shareholders' Equity | $467,438.44 |

This balance sheet shows that the corporation was highly solvent with assets far exceeding its liabilities. It further shows that the basis of taxpayers in their stock was $84,000. Of particular significance is the showing on the balance sheet that as of January 31, 1969, the corporation owed dividends payable to the stockholders in the sum of $22,987.91.

The stipulation further shows the following facts that are important in this case. The earnings and profits (undistributed taxable income) for years prior to the beginning of the fiscal year ending on January 31, 1969, was $36,017.97. This sum had become what is known under Section 1376 of the Internal Revenue Code of 1954,[1] and Treasury Regulations on Income Tax (1954 Code) Section 1.-1376–1, as previously taxed income (PTI), since the taxpayers had paid income tax on these earnings and profits during previous years (prior to 1969) in accordance with Section 1373(b) of the 1954 Code, even though such earnings and profits had not been distributed to them in such prior years.

The earnings and profits of the corporation for its fiscal year ending January 31, 1969, was $21,058.33. This sum is known as undistributed taxable income (UTI), within the meaning of Section 1373(c), during the fiscal year in which the income is earned, and the stockholders (plaintiffs) were required to pay (and did pay) income taxes on it in accordance with Section 1373(b) whether it was distributed to them or not.

The facts further show that prior to January 30, 1969, the plaintiffs as stockholders had borrowed $34,012.09 in cash withdrawals from the corporation, which was reflected on the books of the corporation. On said date, the corporation had $3,465.86 in cash on hand.

This was the situation that existed on January 30, 1969, when a directors meeting was held and the following resolution was adopted:

RESOLVED, That there be declared, and there is hereby declared, a dividend payable to the shareholders of record at the present time in the amount of $57,000, such dividend to be paid as follows: All accounts receivable from R. Hugh McKelvy and Robert H. McKelvy shall be forgiven and cancelled on January 31, 1969 and the balance of such dividend of $57,000 shall be paid in cash on or before April 15, 1969.

On January 31, 1969, the last day of the corporation's fiscal year, the corporation canceled on its books the debts the taxpayers owed the corporation in the total sum of $34,012.09 ($23,363.83 owed by Robert H. McKelvy and $10,648.26 owed by R. Hugh McKelvy), and entered an item on its books showing additional dividends payable to taxpayers in the sum of $22,987.91. (See balance sheet entries above.)

Before determining the legal effect of all of the foregoing facts, events, and transactions on the income tax position of the taxpayers as stockholders in this Subchapter S corporation, the following facts as they existed on January 31, 1969, should be re-emphasized, because they are controlling in the solution of the issues in this case:

1. Taxpayers had a basis of $84,000 in their stock.

2. The corporation had on hand $36,017.97 previously taxed income (PTI).

3. The corporation had earnings and profits for fiscal year ending January 31, 1969, the sum of $21,058.33, which was undistributed taxable income.

4. The corporation was highly solvent with assets that far exceeded its liabilities. (See balance sheet.)

5. The corporation cancelled the debts of the stockholder-taxpayers in the sum of $34,012.09 on January 31, 1969.

---

1. All references to statutory tax provisions are to the Internal Revenue Code of 1954, as amended.

6. The corporation became indebted to the stockholder-taxpayers in the sum of $22,987.91, by the action of the directors on January 30 and 31, 1969.

By the application of the complex statutes governing Subchapter S corporations (Sections 1371–1378) and Regulations 1.1371–1.1378, together with statutes governing Chapter C Corporations (Sections 301–318) which are applicable when not in conflict with Subchapter S sections, it is clear that the actions of the directors and of the corporation on January 30, 1969, in declaring the dividend and on January 31, 1969, in cancelling the debts of the taxpayers on its books in the sum of $34,012.09 and in making entries on its records of an indebtedness owing by the corporation to its stockholders (the taxpayers) in the sum of $22,987.91, resulted in two significant events that affect the rights of the taxpayers. These were (1) the cancellation of the debts of the stockholders was a distribution to them *in money* of the amount of their debts in the total sum of $34,012.09; and (2) the creation of the dividend indebtedness in the sum of $22,987.91 owing by the corporation to the stockholders by the resolution and entries on its books was a distribution of property (a corporate obligation) by the corporation in January 1969, to its stockholders.

I will discuss these events and their legal effect on the issues in this case in the order named. The decided cases support the principle that the cancellation by a corporation of a debt owed to it by a stockholder is a distribution in money to the stockholder at the time of the cancellation. Probably the leading case on this subject is Cohen v. Commissioner, 77 F.2d 184 (6th Cir. 1935), cert. denied, 296 U.S. 610, 56 S.Ct. 129, 80 L. Ed. 433. In that case, the stockholders had made cash withdrawals from the corporation from 1913 to 1927, which were charged as a debit on the corporation's books. In 1928 the corporation's directors by resolution cancelled these debts. The question before the court in

that case was the determination of when was the distribution of the money made to the stockholders. They contended that since no cash or any other property had been received by them in 1928, the cancelled amounts could not be income to them in that year. The court decided otherwise, saying:

\* \* \* [T]here was no evidence of any distribution by the corporation prior to the adoption of the resolution of 1928. \* \* \*

\* \* \* \* \* \*

\* \* \* It was this action in October, 1928, which gave to the petitioners an indisputable right to the amounts previously advanced to them and effected a distribution of the accumulated earnings of the company. The Commissioner properly included them in the petitioners' income for the year 1928. [*Id.* at 185–186.]

The same situation existed in Hudson v. Commissioner, 99 F.2d 630 (6th Cir. 1938), cert. denied, 306 U.S. 644, 59 S. Ct. 584, 83 L.Ed. 1044, where the directors of a corporation cancelled by resolution the cash withdrawals theretofore made by stockholders. The court there held that the distribution occurred in the year the debts were cancelled, saying:

This court has held in Cohen v. Commissioner, 6 Cir., 77 F.2d 184 that cash withdrawals from a corporation made by its stockholders constitute dividends in the taxable year during which corporate action was taken canceling or charging off such accounts against surplus. \* \* \*

\* \* \* We conclude that the principle announced in Cohen v. Commissioner, that there was a distribution of profits, and that income accrued at that time, controls. [*Id.* at 632.]

*See also* Fitch v. Helvering, 70 F.2d 583 (8th Cir. 1934); and Wiese v. Commissioner, 93 F.2d 921 (8th Cir. 1938).

The cancellation of the debts of the stockholders, being a distribution of money, is a non-taxable distribution and is allocated to the earnings and profits

of the taxable year ending January 31, 1969 (on which the stockholders have already paid taxes), in accordance with 26 U.S.C. § 1375(b)[2] and Income Tax Regulation § 1.1373–1(d).[3] Since the earnings and profits for that year were $21,058.33, the distribution of the $34,012.09 in money to the stockholders by the cancellation of their debts is allocated to the $21,058.33 of earnings and profits. This results in the elimination of all of such earnings and profits for that year. However, since the $34,012.09 distribution exceeds the earnings and profits of $21,058.33 by the sum of $12,953.76, such amount is a distribution in money that cannot be allocated to earnings and profits (UTI) since they have been eliminated. The question then arises as to how this excess money distribution in the sum of $12,953.76 can be disposed of. The answer is found in Section 1375(d)(1) which provides as follows:

> § 1375. Special rules applicable to distributions of electing small business corporations.
>
> (d) Distributions of undistributed taxable income previously taxed to shareholders.
>
> (1) Distributions not considered as dividends.
>
> An electing small business corporation may distribute, in accordance with regulations prescribed by the Secretary or his delegate, to any shareholder all or any portion of the shareholder's net share of the corporation's undistributed taxable income for taxable years prior to the taxable year in which such distribution is made. Any such distribution shall, for purposes of this chapter, be considered a distribution which is not a dividend, but the earnings and profits of the corporation shall not be reduced by reason of any such distribution.

Regulation 1.1375–4(a) is also applicable. It provides in pertinent part as follows:

> § 1.1375–4 Distributions of previously taxed income
>
> (a) In general. Under section 1375(d)(1), a distribution by an electing small business corporation to a shareholder of all or any portion of his net share of previously taxed income is considered a distribution which is not a dividend. Such a distribution reduces the basis of the shareholder's stock in the corporation in accordance with section 301(c)(2), and, if it exceeds such basis, is subject to the provisions of section 301(c)(3). The earnings and profits of the corporation are not reduced by reason of such a distribution.
> * * *

2. § 1375. Special rules applicable to distributions of electing small business corporations.
   * * * * *
(b) Dividends received credit not allowed.
The amount includible in the gross income of a shareholder as dividends from an electing small business corporation during any taxable year of the corporation (including any amount treated as a dividend under section 1373(b)) shall not be considered a dividend for purposes of section 37 or section 116 to the extent that such amount is a distribution of property out of earnings and profits of the taxable year as specified in section 316(a)(2). For purposes of this subsection, the earnings and profits of the taxable year shall be deemed not to exceed the corporation's taxable income (computed as provided in section 1373(d)) for the taxable year.

3. § 1.1373–1 Corporation undistributed taxable income taxed to shareholders.
   * * * * *
(d) Determination of dividends in money out of earnings and profits of the taxable year. In applying section 316(a) to distributions by an electing small business corporation, earnings and profits of the taxable year are first allocated to actual distributions of money made during such taxable year * * *.

Also, Regulation 1.1375–4(b) provides in pertinent part as follows:

(b) Source of distribution. * * * [A] distribution of previously taxed income may occur only if during its taxable year the corporation makes such money distributions *in excess of its earnings and profits for such taxable year.* * * * [Emphasis supplied.]

It is clear that this statute and these regulations authorize the distribution of previously taxed income (PTI) by a corporation to its stockholders in money as a non-taxable distribution that is not a dividend. In this case, there was $36,017.91 PTI from prior years. Accordingly, the $12,953.76 excess money distribution became a non-taxable distribution to that ʿextent out of the previously taxed income of $36,017.91, thereby reducing the PTI to $23,064.15.

At this point, we have eliminated the earnings and profits (undistributed taxable income) of $21,058.33 for fiscal year 1969 and have reduced the previously taxed income of $36,017.91 to the sum of $23,064.15.

We now reach the question of the effect of the second part of the dividend declared on January 30, 1969, namely, the creation of a debt owing by the corporation to its stockholders in the sum of $22,987.91 by the resolution and by entering the indebtedness on its books and records on January 31, 1969.

The authorities are unanimous in holding that the declaration of a dividend creates a debt against the corporation in favor of the stockholders. One of the leading cases on this question is Bulger Block Coal Co. v. United States, 48 F.2d 675, 71 Ct.Cl. 636 (1931), wherein this court reviewed many cases on this subject, in pertinent part as follows:

The leading authorities on the relation of a stockholder to a corporation after a dividend has been declared are reviewed in the case of W. E. Caldwell Co., Inc., 6 B.T.A. 47, 51–52, in which it is said:

"The reasoning advanced in the *Stange Case* [1 B.T.A. 810] was to the effect that upon the declaration of a dividend the corporation immediately becomes the debtor of the stockholder for his proportionate part of the dividend, regardless of the fact that actual payment is not to be made until later. There is abundant authority for this proposition and we have seen no authority to the contrary."

Reference is further made to the case of Wheeler v. Northwestern Sleigh Co., (C.C.) 39 F. 347, wherein the court declared:

"By the declaration of a dividend, however, the earnings, to the extent declared, *are separated from the general mass of property, and appropriated to the then stockholders,* who become creditors of the corporation for the amount of the dividend. The relationship of the stockholder to the corporation, as to the amount of the dividend, is thus changed from one of partnership ownership to that of creditor. He thereafter stands * * * with respect to the dividend, as creditor upon a par with other creditors of the corporation. * * * That the dividend is payable at a future date can work no distinction in the right. The debt exists from the time of the declaration of dividends, although payment is postponed for the convenience of the company." (Italics ours.)

That the same rule has been laid down by all of the leading text-writers on corporations is shown in Staats v. Biograph Co., (C.C.A.) 236 F. 454, 458, in which, after quoting from Taylor on Corporations (5th Ed.) § 568; Machen on Modern Law of Corporations, vol. 2, § 1358; Morawetz on Corporations, vol. 1, § 445, the opinion recites:

"But if a board of directors should declare a cash dividend and make a public announcement of the fact, the courts have held that thereafter the board has no right to reconsider and

rescind its action. The reason seems to be that the declaration of the dividend sets apart from the profits of the corporation a sum which is to be paid to the stockholders in proportion to their shares, and that it creates a debt due from the corporation to each shareholder, resulting in the relation of debtor and creditor. *A dividend divides the property which belongs to the corporation into that which the corporation retains and that which the corporation agrees to pay to the stockholders,* and which it is thereby bound to pay. That which one person is bound to pay to another is a debt. Lockhart v. Van Alstyne, 31 Mich. 76, 78, 18 Am.Rep. 156 (1875)." (Italics ours.)

\* \* \* \* \* \*

In McLaran, Administrator v. Crescent Planing Mill Co., 117 Mo.App. 40, 49, 93 S.W. 819, 822, after reviewing the authorities on this point and quoting at length from leading text-writers on the subject, the court reached the conclusion that:

"The doctrine is that *by the mere declaration,* the dividend becomes immediately thereby separated and segregated from the stock and exists independently of it; that the right thereto becomes at once immediately fixed and absolute in the stockholder, and from thenceforth the right of each individual stockholder is changed by the act of declaration from that of partner and part owner of the corporate property to a status absolutely adverse to every other stockholder *and to the corporation itself,* in so far as his pro rata proportion to the dividend is concerned." (Italics ours.) [*Id.* 48 F.2d at 678, 71 Ct.Cl. at 642–643.]

We find the following statement in 18 C.J.S. Corporations § 467:

The declaration of a dividend creates a debt against the corporation in favor of each stockholder to the amount due him as his pro rata share, and this is true although the dividend is made payable at a future date, or "at the pleasure of the company," or at "such time as may be directed by the board." \* \* \* [Footnotes omitted.] [*Id.* at 1114–1115.]

*See* Chesapeake & Del. Canal Co. v. United States, 250 U.S. 123, 39 S.Ct. 407, 63 L.Ed. 889 (1919); Bryan v. Welch, 74 F.2d 964 (10th Cir. 1935), cert. denied, 295 U.S. 748, 55 S.Ct. 826, 79 L.Ed. 1693; Commissioner v. T. R. Miller Mill Co., 102 F.2d 599 (5th Cir. 1939); Lamberth v. Commissioner, 120 F.2d 101 (9th Cir. 1941); Kraft Foods Co. v. Commissioner, 232 F.2d 118 (2d Cir. 1956); and Roe v. Commissioner, 192 F.2d 398, 403 (5th Cir. 1951), rev'g 15 T.C. 503.

In Kraft Foods Co. v. Commissioner, *supra,* the court said:

Further, the doctrine that a dividend creates a debt in favor of the stockholder has always been accorded full legal recognition *in tax cases.* \* \* \* [Footnote omitted.] [Emphasis supplied.] [*Id.* 232 F.2d at 126.]

The instant case being a Texas case, the decision in Commissioner v. Cohen, 121 F.2d 348 (5th Cir. 1941), is particularly in point. In that case the court said:

\* \* \* Under the law of Texas, a declaration of dividends creates a debt owed by the corporation in favor of each stockholder which cannot be rescinded. Although the declaration of this dividend provided that the sums thereunder were payable to the stockholders of record at such times and in such installments during the year as the directors saw fit, the liability of the company accrued as of the date of the declaration, which was prior to the taxpayer's death. \* \* \*

\* \* \* The stockholder receives the value of a dividend when it is declared, for if it is immediately paid he has his stock and his dividend, and if payment is deferred he has the value of his stock increased by the amount

of the dividend upon it. \* \* \* [Footnote omitted.] [*Id.* at 349.]

It appears from these authorities that there can be no dispute of the proposition that in the instant case the directors created a corporate debt on January 30, 1969, in favor of the stockholders in the sum of $22,987.91. This debt was an obligation of the corporation. It was distributed to the stockholders not only by the written resolution of January 30, 1969, but also by the entries on its books and records on January 31, 1969. This was accomplished as effectively by the method used as would have been the case if it had executed notes for the debt and issued them to the stockholders. No citation of authority is necessary to show that a debt or obligation of a corporation owed to its stockholders or anyone else is *property*. It can be assigned, pledged or sued on if not discharged when due. Therefore, it logically follows that the corporation distributed property of the value of $22,987.91 to its stockholders on January 30 and 31, 1969, by the dividend declaration and book entries.

Although the court in its opinion in this case does not discuss the fact that a Subchapter S corporation can distribute property, as distinguished from money, it is clearly permissible and is in fact authorized and contemplated by the statutes and regulations. See Sections 301(a) and (c), 312(a) and 316(a) of the Code and Sections 1.1373–1(d) and 1.1375–4(b) of the Income Tax Regulations. Regulation 1.1373–1(d) provides in pertinent part:

\* \* \* Therefore, such distributions of money are dividends from earnings and profits of the taxable year to the extent of such earnings and profits *even though there may be distributions of property other than money during such taxable year* \* \* \*. [Emphasis supplied.]

Regulation 1.1375–4(b), although recognizing that property may be distrib-

uted, places a restriction on how it may be allocated, provides in pertinent part:

\* \* \* Thus, *a distribution of property* other than money \* \* \* is never a distribution of previously taxed income [PTI]. \* \* \* [Emphasis supplied.]

Thus, it is clear that although property, as distinguished from money, may be distributed, it cannot be allocated to previously taxed income. To put it another way, previously taxed income cannot be distributed as a non-taxable distribution in the form of property.[4] It can only be distributed in money. This means that although there is still $23,064.15 of previously taxed income available, it cannot be allocated to the debt distribution of property to the stockholders in the sum of $22,987.91. What then do we do with this distribution of property? The answer is found in Sections 301(a) and (c) and 316, as well as in decided cases to be discussed later, which provide that if a dividend is not paid out of earnings and profits of the taxable year, it "shall be applied against and reduce the adjusted basis of the stock." *See* Pitcher & Vance, "Locked-in-Earnings"—How Serious a Problem Under Subchapter S, 49 Va.L.Rev. 1516, 1530 (1963). *Also, see* George A. Roesel, 56 T.C. 14, 27 (1971), where the court said:

\* \* \* To the extent that the notes and debentures received by petitioners [a distribution of property other than money] are not deemed to be out of Milling's earnings and profits, the basis of petitioners' respective stock in Milling will be reduced pursuant to the provisions of section 301 of the Code.

Accordingly, the distribution of property to the stockholders in the form of the corporate debt in the sum of $22,987.91, must be applied to a reduction of the basis of the stockholders in their stock which was $84,000, thus leaving their basis in the stock in the sum of $61,012.09.

---

4. Pitcher & Vance, "Locked-In-Earnings" —How Serious a Problem Under Sub-

chapter S, 49 Va.L.Rev. 1516, 1530 (1963).

The foregoing was the situation of the taxpayers and the condition of the corporation at the end of its fiscal year ending January 31, 1969. At that time it elected to terminate its status as a Subchapter S corporation. Then came the transaction of April 12, 1969, which, for all practical purposes, was the only part of the case considered by the court. On that date the corporation issued its checks to the taxpayers in the sum of $22,987.92. The taxpayers endorsed the checks and deposited $22,750.01 to the credit of the corporation, retaining $237.91 in cash.

Before considering what effect this transaction had on the rights of the taxpayers, I would like to point out that much of the court's opinion was devoted to a discussion of two questions that are no longer in the case, namely, (1) whether the taxpayers had constructive receipt of the corporate debt dividend to them on January 30–31, 1969, and (2) whether the issuance of the checks on April 12, 1969, within two and one-half months of the close of the corporation's fiscal year on January 31, 1969, was a distribution of money to the taxpayers in the corporation's fiscal year ending January 31, 1969, within the meaning of Section 1375(f)(1) and Regulation 1.-1375–6(a)(1). Counsel for the taxpayers announced at oral argument that the taxpayers were not relying on either of these propositions. Consequently, I shall not dwell on these questions, as I do not consider that they are material to a decision of the controlling issues in the case.

The effect of the check transaction on April 12, 1969, was twofold. In the first place, it was a distribution of money in the sum of $237.91 by the corporation to the stockholders within two and one-half months of the close of its fiscal year ending January 31, 1969. However, it does not comply with the requirements of Section 1375(f) and Regulation 1.1375–6(a)(1) which provide that any such distribution shall be "a distribution of the corporation's undistributed taxable income for such year"

(i. e., in this case the fiscal year ending January 31, 1969), and shall "be considered a distribution which is not a dividend," because the undistributed taxable income (earnings and profits) for such year was eliminated by the debt cancellation distribution discussed above. Consequently, there was no undistributed taxable income for the fiscal year ending January 31, 1969, to which the cash distribution of $237.91 could be applied. See Randall N. Clark, 58 T.C. 94 (1972). This cash distribution could not be allocated to the remaining previously taxed income in the sum of $23,064.15 because the "carry-back" provisions only authorized money distributions made within two and one-half months of the end of the fiscal year to be allocated to the "undistributed taxable income" of the preceding fiscal year. Therefore, since the distribution of the $237.91 was made in the fiscal year ending January 31, 1970, during which year the corporation was no longer a Subchapter S corporation, such amount must be allocated to the earnings and profits of such year, which were $14,378.30, as a taxable dividend to the stockholders in that year.

However, the second effect of the April 12, 1969, check transaction was entirely different. It will be remembered that after deducting the $237.91 from the checks, the balance in the sum of $22,750.01 was deposited to the credit of the corporation. This was nothing more than a confirmation and *evidence* of the existence of the corporate debt to the stockholders that was distributed to them on January 30 and 31, 1969, described above. The check transaction of April 12, 1969, except for the retained $237.91, related back to the declaration of the dividend on January 30, 1969, and the entries on the books and records of the corporation on January 31, 1969. Proof of this fact is shown by the fact that on January 31, 1969, the stockholders had everything by way of corporate indebtedness to them that they had after the check transaction of April 12, 1969. The check transaction added nothing to

the corporate debt that had been distributed to the stockholders the preceding January. The stockholders had the same debt and obligation of the corporation, except for the $237.91 retained in cash. The old debt had not been extinguished, and, as far as the record shows, has not been paid as of this date. In all fairness, what did the stockholders get on April 12, 1969, except for the $237.91 in cash, that they did not already have as of January 31, 1969?

Clearly, the April 12, 1969, transaction to the extent of the sum of $22,750.01 related back to the events of January 30–31, 1969, and must be regarded as being effective as of January 31, 1969. There is compelling and cogent support for such holding in the cases of Commissioner v. Goldwyn, 175 F. 2d 641 (9th Cir. 1949), aff'g 9 T.C. 510; George A. Roesel, 56 T.C. 14 (1971); DeTreville v. United States, 445 F.2d 1306 (4th Cir. 1971); Zimco Elec. Supply, 40 Tax Court Mem. p. 71–918, para. 71,215 (1971); and Roe v. Commissioner, 192 F.2d 398 (5th Cir. 1951), rev'g 15 T.C. 503.

In the *Goldwyn* case, a dividend was declared in 1930, but it was not paid until 1933. The court held that the declaration of the dividend in 1930 created a debtor-creditor relationship and reduced the accumulated earnings in 1930 and not in 1933 when it was paid as claimed by the Commissioner of Internal Revenue.

In the *Roe* case, the corporation declared a dividend in 1926 to be paid "as funds were available." There was not enough on hand in 1926 to pay the dividend.[5] The dividend was paid in 1943 and 1945. The Commissioner contended there were distributions and taxable dividends in 1943 and 1945, which were "made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings or profits." This is the same argument the government is making in the instant case. The court held in that case that the declaration of the dividend in 1926 created a debtor-creditor relationship and the situation was the same as if the corporation had paid the dividend in 1926 and the stockholders had loaned it back to the corporation. The court further held that the payments of the dividend in 1943 and 1945 were in satisfaction of a debt created in 1926 and were not taxable distributions or dividends in those years.

In the *Zimco* case, the corporation was a Subchapter S corporation, as in the instant case. There the corporation reported income to a stockholder of $9,023.54 during the fiscal year ending October 31, 1963. In the following year, on January 4, 1964, the corporation issued its note in that amount to the stockholder. The IRS contended that the stockholder received a taxable dividend when he received the note in 1964, and that it was a distribution out of the earnings and profits in 1964. The court held that the stockholder did not receive a dividend in 1964 in the sum of $9,023.-54 and that the stockholder made a loan to the corporation in that amount when the dividend was declared in 1963 and

5. The court in the instant case emphasizes the fact that the corporation only had on hand the sum of $3,456.85 in cash when it declared the dividend on January 30, 1969. This is immaterial in view of the sound position of the corporation. The same situation existed in the case of A. D. Saenger, Inc. v. Commissioner, 84 F.2d 23, 25 (5th Cir. 1936), cert. denied, 299 U.S. 577, 57 S.Ct. 42, 81 L.Ed. 426, where the court said:

"* * * That A. & J., Inc., did not carry cash on hand sufficient to pay what it had unreservedly put to the credit of A. D. Saenger, Inc., [the dividend to the stockholder] is unimportant. It could on demand have borrowed it or raised it by sale of some of its investments. * * *" This holding was approved and quoted by the court in Roe v. Commissioner, *supra*, 192 F.2d at 403. This principle is particularly applicable to the instant case where the balance sheet of the corporation showed it had, in addition to the cash, trade notes in the sum of $261,197.48, inventories of $172,811.55, financial reserves of $15,125.74, plus its building valued at $40,630.13. It could no doubt have borrowed the entire amount of the dividend by making a telephone call to a bank. It could certainly have done so by pledging some of the above assets.

that "the note dated January 4, 1964, was merely *evidence* of that indebtedness." [Emphasis supplied.]

The *Roesel* case squarely supports the relation-back theory of the plaintiffs in this case. The corporation in that case was a Subchapter S corporation whose fiscal years ended February 28, 1963, and February 28, 1964, respectively. On those dates it declared dividends and issued checks for $345,000 and $165,745, respectively. On March 1, 1963, and March 1, 1964, the stockholders issued their checks back to the corporation in the amounts of $117,500 and $69,505, respectively, and received notes therefor from the corporation. The court held that the checks constituted money distributions in fiscal years 1963 and 1964, respectively, in amounts equal to the differences in the amounts of the checks, namely, $227,500 in 1963 and $96,240 in 1964, and the balance for each year was a property distribution (*i. e.,* a loan back to the corporation and a resulting corporate debt). However, the significant part of the decision was the holding of the court that the transactions occurred on the dates the dividends were declared, namely, February 28, 1963, and February 28, 1964, and not on the dates the stockholders issued their checks back to the corporation on March 1, 1963, and March 1, 1964, and received notes therefor, which dates were in the following fiscal years. In that case the court said:

> We agree with the respondent that the economic substance of a transaction must govern for tax purposes rather than the time sequence or form in which such transaction is cast. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596. And it is well established that where a series of closely related steps are taken pursuant to a plan to achieve an intended result the transaction must be viewed as an integrated whole for tax purposes. Redwing Carriers, Inc. v. Tomlinson (C.A.5), 399 F.2d 652, and cases cited therein.
>
> * * * [T]he close proximity in time of the purported loans and the issuance of checks by Milling, and the correlation between the amounts purportedly loaned by each shareholder and his interest in Milling, all serve to establish that the purported distributions and loans were but parts of interrelated transactions which must be viewed as such for tax purposes.
>
> * * * Under the circumstances, in substance, the notes and debentures were issued on February 28, 1963, and February 29, 1964. Once an integrated transaction is to be viewed as such for tax purposes, its component parts do not admit of separation. Redwing Carriers v. Tomlinson, *supra,* and cases cited therein. [56 T.C. at 25–26.]

As will be seen from the foregoing holding of the court in *Roesel,* "economic substance of a transaction must govern for tax purposes *rather than time sequence or form in which such transaction is cast.*" [Emphasis supplied.] Furthermore, the court held that where there are a series of closely related steps, the transaction must be viewed as an integrated whole for tax purposes. In this regard, the court held that "once an integrated transaction is to be viewed as such for tax purposes, *its component parts do not admit of separation.*" [Emphasis supplied.] This holding fits our case like a glove. Here there were a series of closely related steps taken pursuant to a plan to achieve an intended result and they must be viewed "as an integrated whole for tax purposes." Once this is done, its component parts cannot be separated. Consequently, the April 12, 1969, check transaction, except for the retained cash of $237.91, must be viewed as the last of a series of closely related steps which cannot for tax purposes be separated from the prior closely related steps. Therefore, as in *Roesel,* the April checks were merely *evidence* of the dividend declared the previous January and related back to that time. As a matter of fact, as pointed out by the court's opinion in this case, the checks were never regarded by the stockholders and the corporation as payments, except for the $237.91 retained cash, and under those circumstances, as was the situa-

tion in the recent case of C. D. and Sarah Fountain, 59 T.C. 696, decided February 22, 1973, the checks were not payments of money to the stockholders.

The case of DeTreville v. United States, 445 F.2d 1306 (4th Cir. 1971) strongly supports the "relation-back" theory of the plaintiffs here. In that case, which involved a Subchapter S corporation, a dividend in the sum of $212,868.64 was declared by the corporation on December 31, 1960, which was in its fiscal year 1960 and issued checks to its stockholders in that amount the same day. On January 6, 1961, which was in its fiscal year 1961, the stockholders issued their checks back to the corporation in the same amount in purchasing shares of insurance stock owned by the corporation equal in value to the previous distribution in 1960. The 1960 checks of the corporation and the 1961 checks of the stockholders were deposited the same day, thus counterbalancing each other. The court considered these related steps as one integrated whole and held that the corporate checks issued to the stockholders in 1960 were not distributions of *money*, but that, considered together, the transactions amounted to a distribution of *property*. In deciding the tax question the court had to decide when the property distribution took place. The government argued that it occurred in fiscal year 1960, *which was a position exactly opposite to the position it takes in the instant case*. On the other hand, the taxpayers contended that the distribution was made in fiscal year 1961 when the stock was issued and when they issued their checks to the corporation. The court ruled in favor of the government and held that the distribution was made in fiscal year 1960. In this regard, the court said:

### III. *The Year of Distribution*

\* \* \* \* \* \*

In this case a 1960 distribution was intended and checks, which represented little more than claim checks on the stock certificates, were issued to the stockholders in that year. Although not controlling, of persuasive significance is the further fact that the certificates were actually dated December 30, 1960, the day before the pretensive checks were issued. We think the District Court was entirely correct in holding that the distribution took place in the very year that the company intended it to take place, even if the company and its shareholders were mistaken as to the nature of that distribution. [445 F.2d at 1312.]

Thus the court related the events that took place in 1961 back to 1960 to conform to the intention of the parties. In like manner, this court should relate the check transaction of April 12, 1969, back to the time of the declaration of the corporate dividend on January 30, 1969, and the distribution of the corporate debt to the stockholders on that date by the declaration, as well as by the entries on its books and records on January 31, 1969.

The court cites the case of Attebury v. United States, 430 F.2d 1162 (5th Cir. 1970), as authority against the "constructive receipt" doctrine, which is no longer involved in our case, and also as authority against the "relation-back" theory. To support both arguments, the court says in its opinion that in *Attebury* "the corporation declared a dividend during fiscal year one." The court is in error in making this statement, because no dividend was actually declared. There was merely an informal agreement between the stockholders, who were the directors, that during the fiscal year they could make drawings on all of the corporation's taxable income for the year as if they were dividends. This could not meet the requirements of a dividend, because, among other obvious reasons, the taxable income of the corporation was not even known at the end of its taxable year. In this regard, the court in *Attebury* said:

\* \* \* It is clear from the record, and the district court specifically found, that Elevators' [the corporation] taxable income was unknown on the last day of the corporation's taxable year. In the light of these findings, it is clear that the *alleged divi-*

*dend* distribution was neither credited to the shareholders nor unqualifiedly subject to their demand as of the last day of the corporate taxable year. [Emphasis supplied.] [430 F.2d at 1171 n. 25.]

It is true that the taxpayers in *Attebury* contended that there had been a dividend and that they were in constructive receipt of it, and that when the drawings were made by them in the following fiscal year they related back to the previous year as payments of corporate debts. But these contentions were contrary to the facts. It is obvious that there could not be a constructive receipt of a dividend that had never been declared on any date nor for any amount. For the same reason, there could be no relation back. What could the drawings relate back to either as to time, amount or corporate action? Furthermore, no dividend amount was credited on the books or records of the corporation to the stockholders in the previous fiscal year, unlike the crediting of the dividend in our case. The case is clearly distinguishable from the case before us.

One last item should be mentioned. When the corporation ceased to be a Subchapter S corporation in 1970, the remaining previously taxed income in the sum of $23,064.15 was required to be added to the basis of the stockholders in their stock, which basis had been reduced to $61,012.09, as discussed above. Therefore, the stockholders entered fiscal year 1970 with basis in their stock in the sum of $84,076.24. See Sections 1376(a), 1372(b)(2) and Regulation 1.-1376–1.

### Conclusion

This is not a case of tax avoidance by the taxpayers. They have paid all taxes owing by them on all undistributed taxable income for the fiscal year ending January 31, 1969, and on all previously taxed income accumulated prior to 1969. They will pay additional taxes in the future when they sell their stock or liquidate the corporation by reason of the reduced basis of their stock. The govern-

ment has received and will receive from the taxpayers all of the taxes to which it is entitled. However, the decision of the court in this case imposes double taxation on the taxpayers contrary to the will and intent of Congress when it enacted the Subchapter S statutes. The purpose of these statutes was to relieve small business corporations of double taxation. *See* Byrne v. Commissioner, 361 F.2d 939 (7th Cir. 1966). Thus the decision is contrary to the spirit and purpose of these statutes.

The analysis I have made of this case in the foregoing paragraphs disposes of every question and issue in the case. However, by contrast, the decision of the court leaves the following questions unanswered and undisposed of:

1. The previously taxed income in the sum of $36,017.91.

2. The undistributed taxable income of fiscal year ending January 31, 1969, in the sum of $21,058.83.

3. The cancellation of the debts owed by the stockholders to the corporation in the sum of $34,012.09.

4. An illusory amount of $21,463.37 as to which the government says "tax effects not determined by I. R.S." It is surprising that the court would go along with this "hide and seek" position of the government on this item, and leave it as an "open-end" element of this case. If the government has not been able to make up its mind on this matter after four years, how can anyone have faith in its conclusions as to the rest of the case?

5. The corporate debt in favor of the stockholders created in January 1969, in the sum of $22,987.91.

These are all important questions and issues in this case. They are closely related and integrated steps in the transactions involved here. Yet, the court leaves them hanging in limbo, with the IRS free to assert other and additional claims according to its whims against the taxpayers with reference to one or

more of them in the future if it desires to do so. I do not think this is proper. In my opinion, the income tax problems of the taxpayers for 1969 and 1970 were submitted to the court in this case and they should all be decided. Our responsibility is not discharged by merely considering the last isolated step in a series of closely integrated transactions.

I would enter judgment for the plaintiffs for the amount prayed for, except for the sum of $237.91 which was received by them in cash on April 12, 1969, which amount should be taxed to them as a dividend out of the earnings and profits of the fiscal year ending January 31, 1970.

## CONCLUSION OF LAW

Upon the foregoing opinion, which contains the essential findings of fact as stipulated by the parties, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petitions are therefore dismissed.