WALTER C. PRESCOTT and AMELIA J. PRESCOTT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Prescott v. Commissioner
Docket No. 5432-82.
United States Tax Court
T.C. Memo 1983-709; 1983 Tax Ct. Memo LEXIS 81; 47 T.C.M. (CCH) 435; T.C.M. (RIA) 83709; November 29, 1983. Joseph B. Alala, Jr. and J. Robert Wren, Jr., for the petitioners. Mathew E. Bates, for the respondent. KORNER
MEMORANDUM OPINION KORNER, Judge: Respondent determined a deficiency of $10,511.05 in petitioners' 1978 Federal income tax. After concessions, the sole issue for decision (as presented by the parties) is whether petitioners received $21,000 of dividend income during 1978 which they failed to report on their return. This case was submitted fully stipulated pursuant to Rule 122. [1] The stipulations of *85 fact, together with the attached exhibits, are incorporated herein by this reference. Walter C. (hereinafter "petitioner") and Amelia J. Prescott, husband and wife, (hereinafter collectively referred to as "petitioners") resided at Gastonia, North Carolina at the time the petition was filed in this case. They filed their joint Federal income tax return for their 1978 calendar year with the Internal Revenue Service Center at Memphis, Tennessee. Prior to and throughout 1978, petitioner was president and sole shareholder of Industrial Electroplating Company, Inc. (hereinafter "IEC"), a North Carolina corporation which files its Federal income tax returns on the basis of a fiscal year ending January 31. [2]IEC qualified as an electing small business corporation under sections 1371 through 1379 during its fiscal year ending January 31, 1978. [3] However, IEC's small business election was terminated for its fiscal *86 years after January 31, 1978. As of January 31, 1978, IEC's total undistributed taxable income as defined in section 1373(c) was $46,710.99. [4] Petitioners reported this entire amount as income on their 1978 joint Federal income tax return. On February 3, 1978, after the close of IEC's fiscal year ending January 31, 1978, and after its small business election had been terminated, IEC distributed a $14,000 check to petitioner in partial distribution of its undistributed taxable income. The proceeds of this distribution were retained by petitioner. On February 28, 1978, IEC gave petitioner a check for $50,000, $32,710.99 of which purported to represent a distribution of the remainder of IEC's undistributed *87 taxable income which existed as of January 31, 1978, and $17,289.01 of which purported to represent a loan from IEC to petitioner. Prior to this purported distribution, on February 28, 1978, IEC had $52,205.42 in its checking account maintained at Independence National Bank, Gastonia, North Carolina. On the same day, petitioner drew a $50,000 check on his individual account payable to IEC and delivered it to IEC. The transfer of the $50,000 check to IEC was cast in the form of a loan from petitioner to IEC with petitioner taking back a demand note payable on or before December 31, 1978, with interest at seven percent. [5]
*88 Following February 28, 1978, IEC made payments to petitioner in discharge of its obligation under the note of February 28, 1978. These payments were made by IEC over the remainder of the year with the following payments being made before April 15, 1978: Payment Date
Amount
March 6, 1978
$ 2,000
March 21, 1978
6,000
April 12, 1978
3,000
TOTAL
$11,000
The remaining principal and interest due under this note were paid by IEC to petitioner prior to December 31, 1978. On their 1978 joint Federal income tax returns, petitioners reported interest income they received from IEC totalling $2,217.56. In the statutory notice of deficiency respondent determined in pertinent part as follows: (a) It is determined that for the tax year 1978 you received dividend income of $21,000.00 from [IEC] which you failed to report on your return. Accordingly, your taxable income is increased $21,000.00. Although respondent has, from the outset, maintained that the transactions between petitioners and IEC which occurred on February 28, 1978, in substance, amounted solely to a distribution by IEC to petitioner of a $50,000 note, respondent has not relied upon this alleged *89 distribution in support of the above determination. Instead respondent relies upon a "constructive distribution" theory in support of his determination. More precisely, it is respondent's position that a corporation which loses its small business election, and which possesses undistributed taxable income for the last year it qualified as an electing small business corporation, must actually distribute its undistributed taxable income within two and one-half months after the close of the last taxable year it qualified as an electing small business corporation. If the corporation fails to do so, respondent claims that any amounts remaining undistributed at the expiration of the two and one-half month period must be taken into income by the corporation's shareholders at that time. Applying these "rules" to the facts of this case (as respondent views them) respondent alleges that IEC had undistributed taxable income of $21,000 which remained undistributed as of April 15, 1978, and therefore contends that this amount must be included in petitioners' income for their 1978 tax year, in addition to the amounts otherwise included by them on their 1978 return.
Thus, on brief respondent *90 frames the issue, and his proposed resolution thereof, in the following terms: As of February 28, 1978, petitioner's subchapter S corporation, [IEC], had undistributed taxable income of $32,710.99. On that date, petitioner and his corporation exchanged $50,000.00 checks, after which the corporation gave him its note for $50,000.00. As of April 15, 1978, two and one half months after the close of [IEC's] taxable year, $11,000.00 was paid, [by IEC to petitioner on the note] leaving a balance of $39,000.00 [due on the note]. Respondent concluded that the $50,000.00 check exchange was of no consequence, since it obviously lacked any economic effect, that the $50,000.00 note could also not result in a distribution since it represented property rather than cash and that the only distribution of undistributed taxable income [IEC] made to petitioner between February 28, 1978 and April 15, 1978 occurred when it paid petitioner $11,000.00 on the note, thereby reducing its undistributed taxable income to $21,710.99. For reasons not in controversy here, respondent ignored $710.99 of that amount and determined that [IEC's] undistributed taxable income of $21,000.00 as of April 15, 1978, was *91 properly includible in petitioner's taxable income for 1978… [because this] $21,000.00 was not distributed to petitioner within two and one half months after the end of [IEC's] taxable year. In their petition, and by their arguments on brief, petitioners make it apparent that they are attempting to resist respondent's determination by showing that all of the undistributed taxable income of IEC was distributed to petitioner before April 15, 1978. Thus, in their petition, petitioners state: (d) [IEC] made distributions of undistributed taxable [sic] income in the form of checks to… Petitioner, in the amount of $46,710.99 during the period of February 3, 1978, to February 28, 1978. On brief, petitioners argue that the form of the transactions of February 28, 1978, between petitioner and IEC, reflected their true substance (i.e., the distribution of all IEC's undistributed taxable income remaining on that date combined with a loan to petitioner by IEC, followed by a loan by petitioner to IEC of $50,000), and therefore argue that respondent's determination that they received $21,000 of dividend income which they failed to report on their return, is erroneous. *92 Respondent's statement of the case and petitioners' response thereto, as well as the stipulated facts and pleadings, make it apparent that a certain amount of confusion is present regarding the operation of the provisions of Subchapter S. It is therefore necessary to begin with an examination of the nature and general framework of Subchapter S as it was in effect during the years in issue. [6]
A qualifying corporation, see section 1371(a), which elects Subchapter S status (i.e., an "electing small business corporation") is relieved from taxation of its income. Section 1372(b). The taxable income, as defined in section 1373(d), [7] of such a corporation is instead taxed to its shareholders on a pro rata basis at the individual shareholders' rates, irrespective of whether such income is distributed to the shareholders or retained in corporate solution.See generally Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, *93 par. 6.05 (4th ed. 1979).
This result is achieved through application of the following statutory mechanics. Amounts actually distributed to shareholders out of current earnings of an electing small business corporation are included in the gross income of the shareholders in the same manner as dividends distributed by nonelecting corporations. [8] See sections 1.1372-1(c)(2) and (7), Income Tax Regs.; DeTreville v. United States,445 F.2d 1306, 1309 (4th Cir. 1971); Clark v. Commissioner,58 T.C. 94, 99 (1972). Amounts of the electing small business corporation's section 1373(d) taxable income which remain undistributed at the close of the corporation's taxable year are then treated as constructively distributed pro rata to the shareholders pursuant to section 1373(b). For purposes of section 1373, the term "undistributed taxable income" is basically the corporation's *94 section 1373(d) taxable income less the amount of money actually distributed during the year out of current earnings of the corporation as specified in section 316(a). [9] Section 1373(c). Like other dividends, year-end constructive distributions under section 1373(b) are deemed to be made out of most recently accumulated earnings and profits [10] and are therefore treated as dividends to the shareholders. See section 316(a) and section 1.1372-1(c)(7), Income Tax Regs. Moreover, section 1373(b) constructive dividends reduce the corporation's earnings and profits just as a corporation's earnings and profits are reduced by actual dividend distributions it makes during the year.Section 1377(a). Finally, a shareholder's basis in his stock is increased by the amount of his pro rata constructive dividend. Section 1376(a). In these respects, section 1373(b) constructive dividends are treated as though the amounts *95 were actually distributed to the shareholders and then reinvested in the corporation as a contribution to capital. See DeTreville v. United States,supra at 1309; Clark v. Commissioner,supra at 100. Once section 1373(b) constructive distributions are included in the shareholder's income, transmuted into corporate capital, and reflected in the shareholder's stock basis as such, through the statutory process outlined above, subsequent distributions of these same amounts to individuals who were required to include such amounts in income as constructive dividends, could not suffer dividend treatment in future years, even if the general corporate distribution rules of Subchapter C were not modified by the provisions of Subchapter S. [11] Under the general distribution rules of Subchapter C, actual distributions to shareholders with respect to their stock must be treated as dividends to the extent of the distributing corporation's current and accumulated *96 earnings and profits, with the distributions being deemed to have been made first out of current earnings and profits and then out of accumulated earnings and profits. [12] See section 316(a); section 1.316-1(a)(1), Income Tax Regs. If a distribution to a shareholder with respect to his stock is in excess of the corporation's earnings and profits, under Subchapter C the amount distributed is to be treated as a tax-free return of capital to the extent of the shareholder's basis in his stock under section 301(c)(2) and any excess is to be treated as capital gain pursuant to section 301(c)(3), assuming the corporation's stock is a capital asset in the shareholder's hands. Since, as discussed above, an electing small business corporation's earnings and profits are reduced by the amount of a section 1373(b) constructive dividend and the shareholder's basis in his stock is increased protanto, a subsequent distribution of these same amounts could not be the source of dividend income to such shareholder. *97 However, the operation of the general Subchapter C distribution rules could work a disadvantage to shareholders of an electing small business corporation which, at the same time, possessed current and accumulated earnings and profits as well as undistributed taxable income which had been previously taxed to the shareholders. [13] under such circumstances, the hierarchy of the source out of which cash distributions are deemed to be made under the general Subchapter C distribution rules discussed above would require that the corporation first distribute its current and accumulated earnings and profits as dividends to its shareholders before a tax-free return of capital in the form of a distribution of previously taxed undistributed taxable income were allowed. *98 This potential disadvantage is somewhat alleviated by two statutory provisions which, in the case of an electing small business corporation with undistributed taxable income, alter the order of the sources out of which cash distributions from such corporation are deemed to be made. The first provision is section 1375(d). However, this provision applies only so long as the corporation's small business election remains in force and does not apply after the election is terminated. See section 1375(d)(2)(A); section 1.1375-4(a), Income Tax Regs. Thus, this provision has no application to the present case and will not be considered further herein. The second provision is section 1375(f), which provides in pertinent part: Any distribution of money made by a corporation after the close of a taxable year with respect to which it was an electing small business corporation and on or before the 15th day of the third month following the close of such taxable year to a person who was a shareholder of such corporation at the close of such taxable year shall be treated as a distribution of the corporation's undistributed taxable income for such year, to the *99 extent such distribution (when added to the sum of all prior distributions of money made to such person by such corporation following the close of such year) does not exceed such person's share of the corporation's undistributed taxable income for such year. Any distribution so treated shall, for purposes of this chapter, be considered a distribution which is not a dividend, and the earnings and profits of the corporation shall not be reduced by reason of such distribution. Moreover, section 1.1375-6(a)(1), Income Tax Regs. provides, in pertinent part, as follows: A distribution may be treated as a nondividend distribution pursuant to section 1375(f) even though the corporation's election was terminated under section 1372(e) for the taxable year during which the distribution is made, if the corporation was an electing small business corporation for its immediately preceding taxable year. Thus, under the above provisions, distributions of money to shareholders by a corporation within two and one-half months after the close of a taxable year which the corporation qualified as an electing small business corporation (hereinafter the "two month grace *100 period") are deemed to first come out of the corporation's previously taxed undistributed taxable income, whether or not the corporation qualified as an electing small business corporation on the distribution date. In effect, therefore, section 1375(f), when applicable, allows a tax-free return of capital prior to the invasion of either current or accumulated earnings and profits. However, it must be emphasized that section 1375(f) applies only to actual distributions of cash; a distribution of property will not qualify. See section 1.1375-6(a)(2), Income Tax Regs.; Clark v. Commissioner,supra at 100. Moreover, a distribution by a corporation of its note is a distribution of property and not a distribution of money for these purposes. Section 1.1375-6(a)(2)(iii); Fountain v. Commissioner,59 T.C. 696, 702-703 (1973); Clark v. Commissioner,supra at 104. Thus when a corporation distributes property, including its own note, to a shareholder after its small business election has been terminated, the normal Subchapter C corporate distribution rules apply to characterize the distribution. See *101 section 1.1372-1(c), Income tax Regs.; Clark v. Commissioner,supra at 104. With the foregoing general principles in mind, we can now address the case before us. IEC's small business election was terminated for its fiscal years after January 31, 1978. On January 31, 1978, IEC had undistributed taxable income of $46,710.99. Petitioners included this full amount in their gross income in accordance with the requirements of section 1373(a). Thus, IEC's earnings and profits were thereby reduced by this same $46,710.99 under section 1377(a), petitioner's basis in his IEC stock was increased by a like amount under section 1376(a) and this $46,710.99 thereby became corporate capital. For its fiscal years after January 31, 1978, IEC's small business election was terminated and any distributions made by IEC to its shareholders after January 31, 1978, must therefore be characterized by reference to the general Subchapter C distribution rules except to the extent section 1375(f) applied to alter those rules. On February 3, 1978, IEC distributed to petitioner, its sole shareholder, a $14,000 check. Respondent does not dispute that this *102 distribution qualified under section 1375(f). This distribution therefore constituted a distribution of a portion of IEC's previously taxed undistributed taxable income for its fiscal year ending January 31, 1978, under section 1375(f) and must be characterized as a tax-free return of capital. See section 301(c)(2), section 1.1375-6(a), Income Tax Regs.IEC's undistributed taxable income was thus reduced to $32,710.99 after this distribution and petitioner's basis in his IEC stock was reduced by $14,000 under Section 301(c)(2) and 1.1375-6(a), Income Tax Regs. The earnings and profits of IEC remained unaffected by this distribution. Section 1.1375-6(a), Income Tax Regs.
On February 28, 1978, the transactions which form the basis of the controversy herein occurred. On that date, IEC gave petitioner a check for $50,000, $32,710.99 of which purported to represent a distribution of IEC's remaining previously taxed undistributed taxable income, and $17,289.01 of which purported to represent a loan from IEC to petitioner. The cash balance in IEC's bank account was $52,205.42 on February 28, 1978. On the same day, petitioner *103 gave IEC his own check for $50,000 in exchange for IEC's note of $50,000 payable to petitioner. IEC made payments on this note of $11,000 prior to April 15, 1978. As outlined above, respondent contends that the substance of the transactions of February 28, 1978, was a distribution by IEC to petitioner of a $50,000 note, and argues that the formally independent steps leading to this distribution should be disregarded for Federal tax purposes. As such, this distribution could not represent a distribution of previously taxed undistributed taxable income under section 1375(f), respondent argues, since it was a distribution of property. As a result, respondent maintains that IEC's undistributed taxable income was not reduced by the transactions of February 28, 1978. To the extent that this undistributed taxable income remained undistributed as of April 15, 1978, respondent contends that such amount must be included in petitioner's 1978 gross income. Respondent cites only section 1373 in support of his proposed legal conclusion. Petitioners argue that the form of the transactions of February 28, 1978, should be respected in this case, and therefore argue that respondent's determination *104 is erroneous. In particular, petitioners point out that on February 28, 1978, when IEC tendered the $50,000 check to petitioner, the cash balance in IEC's checking account was $52,205.42, an amount sufficient to cover IEC's check. Petitioners contend that this fact mandates a finding that the form of the transactions of February 28, 1978, reflected their true substance. We agree with respondent that the purported distribution and loan by IEC to petitioner totaling $50,000 followed by petitioner's immediate loan-back of $50,000 to IEC was, in substance, a distribution of a $50,000 note to petitioner. However, as will be discussed infra, we do not agree with the legal conclusion which respondent contends results from this finding. We will first explain our finding that the transactions of February 28, 1978, must be treated as a distribution by IEC to petitioner of a $50,000 note, and then examine the tax consequences which result from this finding. It is well established that where a formally separate transaction is merely one step in a series of integrated and interdependent steps *105 which are focused upon a particular end result, the transactions must be viewed as an integrated whole for Federal tax purposes and the separate steps leading to this overall result will not be afforded independent significance. Gregory v. Helvering,293 U.S. 465 (1935); Redwing Carriers, Inc. v. Tomlinson,399 F.2d 652 (5th Cir. 1968); Roesel v. Commissioner,56 T.C. 14, 26 (1971); McKelvy v. United States,201 Ct. Cl. 557, 478 F.2d 1217 (1973). Moreover, since petitioner was the sole shareholder and president of IEC during 1978 and was therefore in complete control of that company we must closely scrutinize transactions occurring between petitioner and his controlled entity in determining their substance for Federal tax purposes. Investors Diversified Services, Inc. v. Commissioner,39 T.C. 294, 306 (1962), affd. 325 F.2d 341 (8th Cir. 1963); Bixby v. Commissioner,58 T.C. 757, 776 (1972). Applying the above precepts, the record as a whole in this case convinces us that the purported distribution and loan totaling $50,000 by IEC to petitioner was merely the *106 initial step in an integrated plan which included petitioner's immediately transferring the funds back to IEC. Initially, the time of the issuance of the $50,000 check to petitioner and petitioner's check for $50,000 to IEC - both on the same day - is an indication that these were prearranged, interdependent transactions. Roesel v. Commissioner,supra Additionally, the exact correlation between the amounts purportedly distributed and loaned by IEC to petitioner and the amount loaned back to IEC from petitioner is indicative of the interdependent nature of these transactions. Moreover, when IEC issued the $50,000 check to petitioner, it had only $52,205.42 in its bank account and there is no indication in this record that IEC possessed any other liquid operating assets at that time. Without a recontribution of funds by petitioner to IEC, the operating funds of IEC would thus have been reduced to $2,205.42 at the date of distribution. IEC presumably incurred operating expenses in the early months of 1978 and petitioner has not established that the $2,205.42 remaining in IEC's bank account after the purported distribution of February 28, 1978, would have been *107 sufficient to discharge such costs. Under these circumstances it is only reasonable to conclude that petitioner's recontribution to IEC of the $50,000 purported distribution was mandated by the economics of the situation and contemplated by the parties from the outset. We therefore find that IEC's purported distribution and loan totaling $50,000 to petitioner followed immediately by petitioner's transfer of the same funds back to IEC were interrelated transactions and must be viewed as such for Federal tax purposes. The series of transactions, in substance, constituted a mere distribution of a $50,000 note from IEC to petitioner and the intermediate steps leading to this end result are to be disregarded for Federal tax purposes. See Roesel v. Commissioner,supra at 26. In so holding, we specifically reject an analysis urged upon the Court by petitioners to the effect that a purported distribution from a corporation should be treated as a distribution in substance in any case where the distributing corporation has sufficient funds in its account at the date of distribution to cover the checks representing the purported distribution. Contrary to petitioner's *108 suggestion, this Court has never implied that the fact that a purported distribution by a corporation of a check is adequately covered by funds in the corporate checking account, mandates a finding that the purported distribution was a distribution in substance for Federal tax purposes. The cases petitioner relies upon in support of this contention merely stand for the proposition that the sufficiency of corporate funds on the distribution date is one of many relevant factors to be considered in determining the substance of an alleged distribution. Roesel v. Commissioner,supra at 26; Fountain v. Commissioner,supra at 702. Although the sufficiency of corporate funds on the date of a purported distribution may be a relevant factor in determining whether the giving of a check by a corporation to its shareholder was, in substance, a true distribution, it cannot be absolutely determinative especially where, as here, the alleged distributee is in complete control of the distributing corporation and the purported distribution and loan diminishes the corporation's operating capital to what appears to be a dangerously low level. Rather, all *109 of the facts of record must be examined and weighed in determining whether the relevant transactions constituted interdependent steps focused on a particular end result. Having found that the transactions in controversy must be treated as a distribution to petitioner of a $50,000 note (i.e. property), the tax consequences which flow from this distribution can now be determined. As fully set out above, section 1375(f), upon which petitioners rely, applies to alter the order of the source of corporate distributions which are made within the two and one-half month grace period only if the distributions are of money. The statute has no application to distributions of property and therefore cannot apply to the distribution by IEC to petitioner of the $50,000 note. Rather, this distribution must be characterized by reference to the general corporate distribution rules provided in Subchapter C. Section 1.1372-1(c), Income Tax Regs.; Clark v. Commissioner,supra at 104. Thus, the fair market value of the note must be treated as a dividend to the extent of the IEC's current earnings and profits as of January 31, 1979 (the end of its fiscal *110 year), computed without diminution by reason af any distributions made during such year, see section 316(a)(2) and footnote 12, supra, and IEC's accumulated earnings and profits. Sections 316(a), 301(c)(1). If the distribution exceeded such earnings and profits, it must be treated as a tax-free return of capital to the extent of petitioner's basis in his IEC stock, and as capital gain to the extent petitioner's stock basis is exceeded by the distribution. Sections 316, 301(c)(2), 301(c)(3). See also Estate of Kirk v. Commissioner,70 T.C. 771, 775 (1978), affd. 634 F.2d 1048 (6th Cir. 1980). However, as indicated above, respondent has not relied upon the general corporate distribution rules of Subchapter C in support of his deficiency determination in this case. Rather, respondent presents the unique argument that a corporation which loses its small business election must distribute its previously taxed undistributed taxable income within two and one-half months after the close of its taxable year in which it qualified as an electing small business corporation, and in the event that it doesnot, its shareholders must include in income *111 the amount remaining undistributed at the expiration of the two and one-half month period. This position is fallacious. The entire amount of a Suchapter S corporation's undistributed taxable income must be included in income by its shareholders in their taxable year with which or within which the corporation's taxable year ends under section 1373. Petitioners in this case reported the full amount of the undistributed taxable income of IEC as of January 31, 1978, on their 1978 return. No statutory provision requires a second constructive distribution of this undistributed taxable income at the expiration of the two and one-half month period following the close of the corporation's tax year, as respondent contends. Section 1375(f), when applicable, merely provides rules which characterize actual distributions of cash which occur during this two and one-half month period. Thus, respondent's contention that the fact that IEC had undistributed taxable income which remained undistributed as of April 15, 1978, supports his determination that petitioners had $21,000 of dividends which they failed to report on their return must be rejected as erroneous. However, this does *112 not end the matter. The ultimate question for resolution in this case is whether respondent's determination - that petitioners received $21,000 of dividend income in 1978 which they failed to report on their return - is erroneous. If this determination is correct, we may sustain it even if the legal theory respondent relies upon in support of the determination is erroneous. Helvering v. Gowran,302 U.S. 238, 245-247 (1937); Blansett v. United States,283 F.2d 474, 478-479 (8th Cir. 1960); Alexander Sprunt & Sons v. Commissioner,64 F.2d 424, 426 (4th Cir. 1933); Bixby v. Commissioner,supra at 788. Nor does the fact that respondent may have utilized an incorrect theory in support of his deficiency determination relieve petitioners of their burden of proving that the determination is erroneous, so long as the wording of the deficiency notice was sufficiently broad to encompass an alternative theory. Estate of Finder v. Commissioner,37 T.C. 411, 423 (1961); Sorin v. Commissioner,29 T.C. 959, 969 (1958), *113 affd. 271 F.2d 741 (2d Cir. 1959); Carnrick v. Commissioner,21 B.T.A. 12, 21, (1930).
In this case, the wording of respondent's statutory notice was clearly broad enough to cover a theory other than that proffered by respondent on brief. The statutory notice simply stated, in pertinent part: (a) It is determined that for the tax year 1978 you received dividend income of $21,000 from [IEC] which was not reported on your return. Accordingly, your taxable income is increased $21,000. In particular, we might sustain respondent's determination on the ground that the transactions of February 28, 1978, which we have decided were, in substance, a distribution by IEC of a $50,000 note to petitioner, constituted a dividend to petitioner to the extent of $21,000, nothing in the record appearing to the contrary. Such a holding would be premised upon an assumption that the distribution of the note was covered by current and accumulated earnings and profits of IEC at least to the extent of $21,000, petitioners not having shown otherwise. Sections 301(c)(1) and 316(a). However, such a theory was not raised by respondent or otherwise addressed *114 by the parties. Moreover, the theory upon which respondent did rely did not, in any manner, hinge upon the extent to which IEC possessed earnings and profits. Accordingly, neither party adduced evidence regarding IEC's earnings and profits which, under the theory of the case developed by this Court for the first time, will prove determinative. Under these circumstances, we think it would be patently unfair to enter a decision for respondent on the basis of petitioners' failure to sustain their burden of proving the extent to which IEC had earnings and profits, for if we were to choose such a course of action in this case, we might effectively allow respondent to bootstrap himself by his own ineptitude. In fact, it has been held that where the Court finds that respondent's determination might be supportable on the basis of a theory that neither party had addressed during trial or on brief, and the issue cannot be adequately resolved on the basis of evidence already of record (but must, if decided, be decided on the basis of one party's failure of proof), the proper course of action is to return the case for the taking of further evidence relating to the Court's new theory. *115 Thus, in Helvering v. Edison Securities,78 F.2d 85 (4th Cir. 1935), the Fourth Circuit Court of Appeals [14] stated (at 91): In the pending case, however, the new matter was not introduced by the parties but by the Board [of Tax Appeals] itself, and the subsequent course of the proceedings should have been shaped with this circumstance in mind. A sharp issue was raised as to a point upon which the parties had theretofore agreed, and although some evidence bearing on the subject had been put in the record in connection with the other transactions, it was obviously inadequate for the purpose now under discussion, for the Board itself said that it was difficult to tell from the available facts what had taken place. In this emergency, the Board might well have ordered a rehearing upon its own motion * * *. Even after a full trial below, an appellate court has the power to remand a case for further proceedings if it has been tried on a wrong theory, [Citation omitted]; and it cannot be doubted, in view of the purpose for which the Board was established and of the statutes governing its procedure, that it has equal power to do full justice to the parties while *116 they are still before it. [Citations and footnote reference omitted]. See also Helvering v. Gowran,supra at 247; Baird v. Commissioner,438 F.2d 490, 493 (3rd Cir. 1970). The circumstances described by the Fourth Circuit in Helvering v. Edison Securities,supra, are precisely those presented here. Neither party has addressed the issue of whether the distribution of the $50,000 note constituted dividend income to petitioners. We have held, however, that the fair market value of such distribution would, in fact, represent dividend income to petitioners in 1978 to the extent of IEC's current and accumulated earnings and profits as of January 31, 1979. But no evidence relating to IEC's earnings and profits has been submitted into evidence since neither party was aware that such evidence would prove determinative of the issue in this case. Under these circumstances, considerations of reasonable notice as well as fundamental fairness dictate that we return this case for the taking of further evidence pertaining, to the fair market value of *117 the $50,000 note, IEC's earnings and profits and petitioner's basis in his IEC stock. [15] The parties will not, however, be allowed to relitigate issues concerning the substance of the transactions of February 28, 1978, which we fully dispose of in this opinion. Those transactions were, in substance, a distribution by IEC of a $50,000 note to petitioner, and to the extent that such distribution was covered by earnings and profits of IEC, it will be treated as a dividend for Federal tax purposes. Since, as we have held, respondent's determination in his statutory notice was sufficiently broad to include the correct theory of the case, as we have determined it to be, the burden of proof as to this new theory remains upon petitioners, Estate of Finder v. Commissioner,supra;Sorin v. Commissioner,supra;Carnrick v. Commissioner,supra; Rule 142(a), except to the extent that respondent asserts a deficiency in excess of that determined in his statutory notice. Rule 142(a). To reflect the foregoing, *118 An appropriate Order will be entered.
Footnotes
1. All references to Rules herein are to the Tax Court Rules of Practice and Procedure. All statutory references herein are to sections of the Internal Revenue Code of 1954 as amended and in effect during the years in issue, unless otherwise specifically stated.↩
2. The record does not disclose petitioner's basis in his IEC stock. ↩
3. Neither the nature of IEC's business, nor the length of time IEC has been in existence is disclosed in the record. Moreover, the record does not disclose whether IEC was originally formed as an electing small business corporation, or assumed that status after operating under another form.↩
4. The record does not disclose the amount of IEC's earnings and profits at any time relevant herein.↩
5. In stipulating to the transactions of February 28, 1978, the parties employed the terms "loan" and "distributions" to describe the various purported transfers of funds between petitioner and IEC. It is clear, however, that both parties were fully aware that the substance of these transfers was the specific issue in dispute in this case and that neither party intended to stipulate away his case by employing in the stipulations terms such as "loans" and "distributions," as petitioner seems to contend on brief. Accordingly, we read the parties' stipulations to merely represent an agreement between them as to the form in which the particular transactions of February 28, 1978, were cast and not an agreement as to the substance of those transactions.↩
6. The Subchapter S Revision Act of 1982, Pub. L. No. 97-354, 96 Stat. 1669, significantly altered the rules applicable to electing small business corporations. These new rules are effective generally for tax years beginning after 1982.↩
7. Section 1373(d) requires taxable income to be computed for these purposes without regard to any not operating loss deductions otherwise allowed by section 172 and without regard to deductions allowed under part VIII of Subchapter B (other than deductions allowed by section 248).↩
8. Except that the shareholders are not entitled to a dividend received exclusions. See section 1375(d)↩. 9. For these purposes, the corporation's taxable income is also reduced by the amount of taxes imposed by sections 56 and 1378(a), if any.↩
10. For purposes of simplicity, all references to "accumulated earnings and profits" herein are intended to refer only to earnings and profits accumulated after February 28, 1913.↩
11. For a general discussion of this point, see Note, "Locked-In Earnings" -- How Serious a Problem Under Subchapter S? 49 Va. L. Rev. 1516↩ (1963). 12. For these purposes, current earnings and profits of the taxable year must be computed as of the close of the corporation's taxable year without diminution by reason of any distributions made during the taxable year, and without regard to the amount of earnings and profits at the time the distribution was made. Section 316(a)(2); section 1.316-1(a)(1)(ii), Income Tax Regs. Cf. Anderson v. Commissioner,67 T.C. 522, 568-570↩ (1976).
13. An electing small business corporation, or a corporation whose small business election has been recently terminated, could have earnings and profits for one or more of the following reasons: The corporation could have accumulated earnings and profits prior to making its small business election; the corporation could have accumulated earnings and profits which were not included in taxable income while the small business election was in force and which were not distributed, see e.g. section 1.312-6(b), Income Tax Regs.↩; and the corporation could have generated earnings and profits after the election was terminated.
14. An appeal in this case would lie with the Fourth Circuit.↩
15. The parties will also be afforded an opportunity to amend their pleadings to conform to the proof in this case.↩